# NEW YORK AND COLORADO MINING SYNDI-CATE AND COMPANY *v.* FRASER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 204. Argued March 14, 1889.— Decided April 15, 1889.

Unless the fact upon which a reversal of a judgment is claimed appears in the record sufficiently to be passed upon, the judgment will not be reversed.

In an action to recover for goods sold and delivered, a copy of an itemized account of them may be handed to a witness to refresh his memory in regard to the matters contained in it.

Evidence that a witness is familiar enough with gold mills to know what they can perform and what they can earn, but that he has only seen one silver mill, being the one in controversy, lays no foundation for his testimony as to the fair rental value of. that silver mill.

In the absence of other and better evidence, the rental value of a silver mill may be shown by proof of the amount of ore delivered and milled.

The declarations of the defendant's agent as to matters within the scope of his authority were properly admitted in evidence.

When the exception to the refusal of a request to instruct the jury shows no evidence tending to prove the facts which the request assumes to exist, there is nothing before the court for consideration.

The legal rate of interest upon the cost of a silver mill may be taken by a jury as its fair rental value, in the absence of other evidence concerning that value.

In estimating damages resulting from the stoppage of a mill, the jury may take into consideration the wages of the men thrown out of work while the mill was idle.

THIS writ of error was brought to review a judgment entered upon a verdict for $10,500 in favor of the defendants in error. The case originated in five different suits, brought by them against the plaintiff in error in the Circuit Court of the

United States for the District of Colorado, the first on a promissory note made by it for $1000, and also for $2531.78 for the price of goods, wares and merchandise sold and delivered by them to it. The other four were suits on promissory notes given by the defendant to the plaintiffs for $1500, $2000, $1500 and $4000, respectively. Afterwards, upon motion of the defendant, these several suits, by order of the court, were consolidated into one. In obedience to this order, the plaintiffs filed a consolidated complaint setting forth these causes of action, the first five being the promissory notes just mentioned, and the sixth being for the goods, wares and merchandise stated as the second cause of action in the first of the afore-mentioned suits.

The defendant in its answers, original and amended, denied the alleged sale and delivery of the goods as set forth in the sixth cause of action, admitted that it had made the promissory notes sued on and that they were unpaid, but denied its liability thereon. The other defence consisted in the allegation of a special contract between the parties, plaintiffs and defendant, previous to the execution of the notes, and as consideration therefor, whereby the former agreed to manufacture and to sell to the defendant, for and at the price agreed, a roasting cylinder and the necessary apparatus connected therewith, described in the plea, and also to manufacture for and deliver to the defendant a twenty-stamp dry-crushing silver mill and its connected apparatus; and to erect and put the same in their places so as to be run and operated at the mine owned by the defendant in the county of ———, State of Colorado, known as the ——— mine; all of which (cylinder, mill and connections) the plaintiffs warranted, when put in their proper places, under the directions of one Angus McKay, would properly and satisfactorily and in all ways subserve the purposes for which they were purchased by the defendant. The plea further alleged that the cylinder, mill and apparatus, when erected and put in their places, were defective in many particulars, so as to be unfit for the uses for which they were designed, and that by reason of these defects the consideration of the notes failed; and, that to remedy the

same and make the mill operate with efficiency, the company was put to large expense for material and new machinery, and was subjected to great loss and damage by the long period of delay in the operations of the mill. The expenses and the special damage thus sustained were pleaded as a failure of consideration, set-off, counter-claim and recoupment.

On the trial the plaintiff introduced as a witness William J. Chalmers, who testified as to the execution by the defendant of the promissory notes sued on, and further testified in answer to questions asked as follows:

"Q. Has the firm [meaning the plaintiffs] now any account, not including these notes, against the defendant?

"A. Yes, sir.

"Q. [Paper shown witness.] Look at that account and see whether this is a copy of the account?

"A. Yes, sir.

"Q. State whether the articles mentioned in that account were ordered by the defendant. And if so, when?"

To which question counsel for defendant objected on the ground that the items could not be proved wholesale by the list, but the objection was overruled by the court; to which ruling of the court defendant then and there excepted.

And thereupon the witness proceeded:

"A. They were ordered at various times, by letter and verbally, between the 25th day of July and December 30, 1882."

The witness then proceeded to read the paper handed him, showing an itemized statement of account aggregating $2531.78. Said witness further testified as follows:

"Q. You may reckon the interest [on said account] from January 1, 1883, up to this time, at six per cent.

"A. $233.59." \

To which question and answer the defendant objected on the ground that it was immaterial, but the objection was overruled by the court; to which ruling defendant then and there excepted.

The defendant introduced as a witness one George K. Sabin, who testified that his occupation for the past twenty years had been mining, and that he was in the employ of the defendant

as superintendent at the time of the erection of the mill in controversy, and so continued until the mill was shut down. He further testified *inter alia*, as follows:

"I have been engaged in mining twenty years, and am acquainted with stamp mills, quartz mills and mining machinery.

"Q. What was the fair rental value of this mill and its attachments? And in giving your answer you can give it at so much per month, year or such other division of time as may be most convenient and intelligible."

To this question counsel for plaintiffs objected on the ground that it was not the proper measure of damages, and further, because the witness had not shown himself competent to speak on the subject; and the objection was sustained on the last-mentioned ground by the court; to which ruling and decision of the court the defendant then and there excepted.

"Q. Have you been engaged about mills enough to know what work they perform — what they can do — what they can earn?

"A. I have of gold mills. This was the first silver mill I was connected with.

"Q. Do you know their cost?

"A. I think I do know something of their cost; have been engaged in their construction. The cost of this mill was about $75,000, inclusive of the machinery and everything connected with it.

"Q. What was the fair rental value per month of this mill and its attachments?"

To this question counsel for plaintiffs objected on the ground that the witness had not shown himself competent, and the objection was sustained by the court; to which ruling the defendant then and there excepted.

The said witness further testified that the defendant company operated a mine near this mill from which the ore was procured to run through said mill.

"Q. Was there sufficient quantity of ore in this mine accessible to employ the mill and keep it running to its full capacity?

"A. Yes, sir.

"Q. How long have you been mining and been acquainted with ores?

"A. I have been mining since 1860.

"Q. Have you, during the same time, been acquainted with the milling of ores?

"A. Yes, sir. This mill at Columbus was the first silver mill I had been with; had been engaged in gold ores.

"Q. You have been acquainted to some extent with silver ores and silver mills?

"A. Yes, sir.

"Q. What was the value of these ores delivered at the Columbus mill in this raw state, as taken from the mine ready to be melted; what was the value for milling purposes?"

To this question counsel for plaintiffs objected, and the objection was sustained by the court; to which ruling the defendant then and there at the time duly excepted.

"Q. Do you know of any silver mills of the same kind in that neighborhood?

"A. No, sir; there are none in that immediate neighborhood.

"Q. At what distance away do you know of any?

"A. Up in Leadville. I do not know of any in operation now. There was one in operation the other side of Leadville a year ago, in Soda Creek.

"Q. Do you know of any silver mills being rented at Leadville?

"A. I do not know of any being rented in the State anywhere."

The defendant also introduced as a witness A. E. Smith, who, being duly sworn, testified that for twelve years he had been running stamp-mill works and quartz mills, and manufacturing assayers' supplies; that he had been in the employ of defendant, as foreman of the mill at Columbus, Colorado, from March, 1882, to December, 1883, and that he had aided in the erection of the mill in controversy. He also testified, in answer to questions as to the capacity and work of said mill, as follows, to wit:

"A. In the month of September (1882) we milled 721 cars of ore, which averaged 1200 pounds each, which makes an aver-

age of 13 tons a day. In October we run 977 cars, which averaged 1200 pounds each, averaging 19 tons a day and a fraction, and in November 117 cars, 22 tons per day; in December 902 cars, 18 tons a day.

"Q. Can you state 'the amount of ore that was milled during the months of March and April following?"

To this question counsel for plaintiffs objected on the ground that it was immaterial, irrelevant and incompetent, and the objection was sustained by the court; to which ruling and decision defendant excepted.

"Q. Can you give the amount of ore that was milled during the month of January?"

To this question counsel for plaintiffs objected on the ground last above given, and the court sustained the objection; to which ruling and decision of the court the defendant then and there excepted.

"Q. What was the capacity of that mill per day upon that ore from September 4 to December 31, 1882, but for the defects in the cylinder and conveyers which have been described?

"A. We run 30 tons a day afterward.

"Q. With the mill in good working order, what would have been its capacity?

"A. 30 tons per day.

"Q. What was the worth of milling that ore per ton?"

Plaintiffs' counsel objected to this question on the ground that it was immaterial and not the proper measure of damages.

By the court (to the witness):

"What was the cost?

"A. About six dollars per ton and a few cents."

The witness further testified as to the expense of operating the mill, the number and wages of the men, and cost of fuel, the number of days the mill was idle, wholly or partially, by reason of the defects complained of, the saving of wages by diminution of the working force when the mill was idle, and the extent to which employés were turned to other labor while the mill was not running, and was then further interrogated by counsel for defendant:

"Q. What wages would you have been compelled to pay to

other men had you employed them to do that same work for which you paid these men, during the time the mill was stopped?"

. To this question counsel for plaintiffs objected, and the objection was sustained by the court; to which ruling and decision of the court defendant then and there excepted.

The defendant also introduced as a witness one H. A. Hurlbut, who testified that he was a managing director of the defendant company in 1881 and 1882, and also testified, among other things, that one Riotti was a mining expert and a metallurgist, upon whom the defendant relied as to the best method of extracting silver from the ore; that upon his recommendation the white roasting furnace had been selected, and that defendant had employed the plaintiffs as machinists to erect it; that the defendant relied on said Riotti as to the proper process for the separation of the ores, but relied solely on the plaintiffs for the mechanical construction and erection of the machinery; and further, in answer to questions, testified:

"Q. What was Riotti directed or authorized to do about the specifications?

"A. He was authorized to give the draughtsman the incline of the hill — the room there was into the base of the retaining wall — the relative positions of where the stamps and the roasting cylinder were to be and where the furnace should be placed in position, and to give relative positions and distances.

"Q. Had he anything to do with the mechanical construction of the mill?

"A. No, sir."

The plaintiffs recalled, in rebuttal, the witness William J. Chalmers, who further testified:

"Hurlbut said that Riotti had been engaged by the New York parties as consulting engineer, as they wanted to hold some one responsible for the working of the ores. We were notified to comply with Riotti's directions. In looking over the original plan of the furnace the conveyors were shown in the plan, but Riotti said he preferred . . . desired us to follow the drawing in making the furnace. This drawing showed the conveyors, as afterwards put in the mill. We

changed the original specifications; they were never accepted by the company, they refusing to accept them. We had the acceptance of Riotti of the plans."

At the conclusion of the testimony the defendant requested the court in writing to give to the jury the following instructions on the right of defendant to recoup damages in said cause:

"If the plaintiffs undertook to supply and put up, so it should be complete and in good running order, the mill or machinery mentioned in defendant's second defence, and entered upon the performance of such agreement, and if the machinery supplied proved defective and mechanically inadequate for the purpose intended, or was not complete nor executed in proper manner, or if the work was unskilfully performed, then, in this action, the defendant would be entitled to recover from the plaintiffs the damages actually sustained by reason of such failure of the plaintiffs to perform their agreement; and, in measuring the damages, if any, sustained by defendant, you may consider the loss of the use of the mill and machinery, either wholly or partially, resulting from such defects and unskilful performance; and any sums paid out by defendant in remedying defects and making repairs in such mill and machinery in consequence of such defects."

Which instructions the court refused to give, and to such decision and refusal the defendant then and there at the time duly excepted.

"In estimating defendant's damages in consequence of plaintiffs' breach of their undertaking, if you find there was such a breach, you may also consider the necessary and immediate loss of profits incurred by the defendant during the period when the said defendant was, by reason of the alleged defects, deprived of the use of such mill and machinery."

Which instructions the court refused to give, and the defendant excepted.

After the conclusion of the evidence and the argument of counsel in said cause the court, of its own motion, instructed the jury as to the law of said cause, and on the question of the measure of defendant's damages, the court gave certain in-

struction's, to the giving of which, and to each several proposition therein contained, defendant at the time duly excepted.

*Mr. Henry Edwin Tremain,* (with whom were *Mr. Mason W. Tyler* and *Mr. James C. Spencer* on the brief,) for plaintiff in error, cited: *Kellogg Bridge Co.* v. *Hamilton,* 110 U. S. 108; *Western Union Telegraph Co.* v. *Hall,* 124 U. S. 444, and authorities cited; *Booth* v. *Spuyten Duyvil Rolling Mills,* 60 N. Y. 487; *Hadley* v. *Baxendale,* 9 Exch. 341; *Horne* v. *Midland Railway Co.,* L. R. 8 C. P. 131; *Cutting* v. *Grand Trunk Railway,* 13 Allen, 381; *Simpson* v. *London & Northwestern Railway,* 1 Q. B. D. 274; *Pickford* v. *Grand Junction Railway,* 12 M. & W. 766; *Wilson* v. *Lancashire & Yorkshire Railway,* 9 C. B. (N. S.) 632; *Hinckley* v. *Pittsburg Steel Co.,* 121 U. S. 264, and cases cited; *United States* v. *Behan,* 110 U. S. 338, and cases cited; *Fletcher* v. *Tayleur,* 17 C. B. 21; *Terra Haute &c. Railroad* v. *Struble,* 109 U. S. 381; *Rhodes* v. *Baird,* 16 Ohio St. 573; *Schile* v. *Brokhaus,* 80 N. Y. 614; *Hinckley* v. *Beckwith,* 13 Wisconsin, 31; *Davis* v. *Talcott,* 4 Barb. 600.

No appearance for defendants in error.

MR. JUSTICE LAMAR delivered the opinion of the court. He stated the facts in the foregoing language, and continued:

The first and second assignments of error rest upon the same ground, and may be considered together. They are, first, that it was error for the court, upon the examination of the witness Chalmers, (who was also one of the plaintiffs,) to admit in evidence the paper handed him showing an itemized statement of account aggregating $2531.78. It is contended that evidence of this character, "an unproved copy of an unproved account," was inadmissible to show the alleged sale and delivery of merchandise; and, second, that the court erred in holding such inadmissible testimony to be sufficient evidence of an indebtedness to permit interest on it to be recovered, as testified to. The assumption of fact involved in these assignments, that the paper was admitted in evidence, is not sufficiently supported by the statement in the bill of exceptions.

To obtain a reversal of a judgment it is necessary that the fact, upon which such reversal is claimed, should appear, from the record, sufficiently to be passed upon.

This bill of exceptions falls far short of a distinct statement that the paper was admitted in evidence; on the contrary, we think the import of the language is that it was not admitted, but that it was handed to witness and read and used by him as a memorandum with which to refresh his recollection of the articles mentioned in the account of plaintiffs. We do not think the court erred in allowing this to be done, and permitting his testimony to go to the jury for what it was worth.

The third assignment of error is, that the court erred in refusing to allow the witness Sabin, introduced in behalf of the defendant, to answer the question, "What was the fair rental value per month of this mill and its attachments?"

This ruling of the court was manifestly proper. It appears from the testimony of the witness himself that he knew of no other silver mill in the neighborhood of Columbus; that he knew of none whatever at that time in operation; that he knew of no silver mill that had been rented in Leadville or in the State anywhere; and that this was the first silver mill he had ever been connected with, though he had been engaged in mining for twenty years, and was acquainted with gold mills enough to know what work they can perform and what they can earn. He evidently had no such knowledge of the marketable condition or rental value of such property as would render his opinion of any use to the jury beyond the merest guess or conjecture. His knowledge and experience of mining mills was such as to render him competent to testify as to the cost of construction, the value of machinery and the expense of putting it up; and upon these points his testimony was admitted, and was to the effect, among other things, that the mill cost $75,000.

The fourth, fifth, sixth and seventh assignments of error are based upon the rulings of the court on the objections of the plaintiff to the other questions propounded by the defendant to the witnesses Sabin and Smith.

It does not appear clearly from the bill of exceptions for

what purpose these questions were propounded. Evidence to show that the capacity of the mill was thirty tons a day had been offered and received to prove the rental value of the mill, and perhaps very properly, as that might be a necessary preliminary fact leading up to the determination of its value for the rental. But after the defendant utterly failed to show, by any admissible evidence, that there was any rental value for a mill of that kind, we think the court did not err in holding that such rental value could be shown by proving the value or the amount of ore delivered and milled. If, however, the object of these questions (as counsel contends in his brief) was to prove the actual loss of use of the machinery during the period of stoppage, or the loss of the profits that would have accrued but for the defective machinery, the answers most favorable to defendant could only have tended to show losses too undefined to be subject to computation, and profits too remote and speculative to be capable of ascertainment. The ingenious argument of counsel fails to convince us that the court erred in sustaining the plaintiffs' objections to the questions.

The ninth assignment of error is, that the court admitted the evidence of the declarations of one Riotti, with regard to the placing of the machinery of the mill, to go to the jury. The introduction of this evidence was objected to upon the ground that Riotti was not an agent of the defendant in respect to the matters covered by these alleged declarations.

The objection does not seem to be valid. The witness testified that Riotti was authorized by defendant, in respect of the specifications in the contract between the parties, to give the draughtsman the incline of the hill, the room there was into the base of the retaining wall, the relative positions of where the furnace should be placed in position, and to give relative positions and distances. The witness Chalmers, being recalled, testified that " we were notified to comply with Riotti's directions. In looking over the original plan of the furnace the conveyors were shown in the plan. But Riotti said he preferred . . . desired us to follow the drawing in making the furnace. This drawing showed the conveyors, as afterwards put in the mill."

We think this direction or declaration of Riotti was made with reference to the very matters which, according to the testimony of Hurlbut and Chalmers, were directly within the scope of his authority and duty.

We do not deem it necessary to consider the questions whether the instructions requested by the defendant, as above set forth, and refused, are correct, as abstract propositions of law, with regard to the general principles governing the right of recoupment of damages. The bill of exceptions does not show any evidence tending to prove all the facts which these instructions assume to exist. The counsel for plaintiff in error presses the argument that the effect of the exclusion of the questions above mentioned shut out all evidence of the necessary and immediate loss of profits during the time when, by reason of the alleged breaches of the agreement, the use of the mill and machinery was lost to it. It would, in our opinion, have been error to give instructions applicable to evidence not admitted. The legal principles in those instructions, as requested, were, so far as they were founded on the evidence, substantially put before the jury in the general charge of the court.

The bill of exceptions states only so much of the charge as relates to the question of damages in the cause. The learned judge having, as we are authorized to assume, fairly left to the jury the facts as to the alleged breaches of the contract, instructed them that, if they found the defendant entitled to deduct from the plaintiffs' claim its damages resulting from the delay in the operations of the mill caused by the defective machinery, it was undoubtedly entitled to deduct therefrom the rental value of the mill. Recapitulating the evidence on this point, he then instructed the jury that, in the absence of all evidence as to the rental value, they were at liberty to allow interest on the investment; and that it was shown in evidence that the mill cost $75,000; so that, if they found that the defendant was entitled to damages for delay in running the mill, they would properly allow interest at ten per cent per annum (which was the statutory rate in Colorado, Gen. Stat. Col. 1883, § 1706) for the time of the delay as

proven. He instructed them further, that there was more in the way of damages shown in the wages of the men employed in the mill whose time was lost while the mill was idle, and that for this loss of time, during which they were receiving wages from the defendant, the amount so paid could be added as an element of damages to be deducted from the plaintiffs' demand.

We think the law of the case was fully disclosed to the jury, and that fuller or more specific instructions were not required.

The judgment of the Circuit Court is

*Affirmed.*