BIEN & CO. v. HESS.

(Circuit Court of Appeals, Second Circuit. May 28, 1900.)

No. 28.

1. LANDLORD AND TENANT—BREACH OF COVENANT TO REPAIR—EVIDENCE.

Evidence that want of repair of leased premises diminished the productiveness of a part of the lessee's manufacturing plant from 20 to 25 per cent. is too indefinite to warrant the jury in making a finding as to what extent the rental value of the premises was decreased by the lessor's failure to keep in repair pursuant to a covenant of the lease, though the rental value of the whole is known.

2. SAME—LOSSES RECOVERABLE.

A tenant cannot recover of the landlord, as damages for breach of a covenant to keep the leased premises in repair, profits which he might have made, or for losses which he might have avoided, but only for the difference between the rental value of the premises as they were and what it would have been if in repair, taking into consideration the purposes for which they were to be used.

3. SAME—MEASURE OF DIMINUTION OF RENTAL VALUE.

Where a tenant of premises used for manufacturing purposes claims damages for diminution in the rental value of leased premises by reason of the lessor's breach of a covenant to keep the premises in repair, the decreased rental value of the premises should be ascertained by deducting from the agreed rental the sum which the lessor was obliged to expend for help and in operating the plant after the usual hours in order to turn

out the quantity of work. which, but for the defective condition, could have been turned out during the usual working hours; hence it is error to exclude evidence tending to show the amount expended to keep the plant running overtime to turn out a normal quantity of work.

In Error to the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon a writ of error to review a judgment of the circuit court, Southern district of New York, entered upon a verdict which was directed in favor of the plaintiff below, who is defendant in error. The action was brought to recover for one quarter's rent of premises No. 140 Sixth avenue, under a lease made by Sayles to defendant (plaintiff in error), at a rent of $10,000 a year. The facts sufficiently appear in the opinion.

Franklin Bien, for plaintiff in error.

M. G. Holstein, for defendant in error.

Before LACOMBE and SHIPMAN, Circuit Judges, and THOMAS, District Judge.

LACOMBE, Circuit Judge. There is no dispute as to the lease, assignment, rent, etc.; the only questions arise upon breach of covenant to keep the premises in proper repair.

In directing the verdict the trial judge said:

"I am of the opinion that the lessor under the lease was bound to keep the premises in proper repair, to render them tenantable for the uses and purposes for which, by the lease, it was contemplated they would be occupied. The covenant of the lease in this respect is somewhat vague, and there is some reason, perhaps, for the position taken by the plaintiff in this case, that the terms were not such as to compel the lessor to make the repairs. However, from that view I differ. But I am of the opinion that there is not sufficient competent evidence to enable the jury to ascertain what the damages were. The only damages which the law recognizes in such a case is the extent of the diminution of the value of the leased premises during the time when the repairs were not made. and we are given nothing here by which we may determine how much that was. The lessee claims that, because his landlord has not repaired the premises according to the covenant of his lease, he can recover for all damages to his business, consequential and remote. But he cannot recover such damages. The law does not recognize that rule of damages. It would open the door to too many uncertainties altogether. If the repairs are of a trifling nature, then the lessee has a right to make them, and deduct the cost from the rent; if they are of a serious nature, then he is entitled to recover for the impaired rental value of the premises during the time of the existence of the breach. That is the measure of damages, and no other, and there is no evidence in this case by which we can determine that; so I direct the jury to find a verdict for the plaintiff."

Many of the matters originally in dispute are, upon this review, to be taken as decided in favor of the defendant. Thus, it will be assumed that the lessor was bound to keep the premises in repair and tenantable; that for part of the time he failed to do so as to a substantial portion of the premises; and that the repairs were not of such a trifling character as to warrant the restriction of recovery for damages to the cost of making them.

The measure of damages adopted by the circuit judge, viz. the impaired rental value of the premises during the time of the existence

of the breach, is sanctioned by the authorities quoted by both sides. In Cook v. Soule, 56 N. Y. 420, the leaky roof of a stable was held a breach of the covenant to repair. Evidence was given tending to show the value of the use of the premises in the condition they were, and what they would have been worth if in good repair, and also (under exception) further evidence showing that because of the leaks wagons and harness were injured. The general term (1 Thomp. & C. 116) sustained the admission of the evidence excepted to on the ground that the jury might allow as damages either the difference in value of the use of the premises or the injury to the tenant's property, but the court of appeals repudiated such a rule, although they held the evidence admissible on other grounds. "The only rule of damages given to the jury * * * was the difference in value of the use of the premises as they were and as plaintiff agreed to put them. * * * That the rule of damages is correct was determined by this court in Myers v. Burns, 35 N. Y. 269." In the case last referred to there was a lease of hotel property. During some portion of the time four rooms, through a defect in the flues of the chimney, were of no use to defendant. The court of appeals approved a charge that defendant was entitled to counterclaim "the fair value of the use of such rooms for the time they were unoccupied." In Hexter v. Knox, 63 N. Y. 561, the lessee of the Prescott House, a hotel property, brought an action to recover damages for breach of contract to complete a new building and for failure to make repairs, by reason whereof certain rooms were untenantable. It was held that the lessee was entitled to the rental value of the rooms for hotel purposes during the time he was deprived of them by the default of the lessor, and that as to such of the rooms for which plaintiff had furniture he was entitled to damages based upon the value of their use as furnished rooms.

Two questions, therefore, are presented: First, whether there was evidence in the case from which the jury might determine the value of the use of the premises as they were and the value as they would have been had they been kept in proper repair, or, in other words, what was the rental value, for the purposes of the manufacturing business which defendant carried on, of that part of the premises of which, by reason of the lessor's neglect, it temporarily lost the use; and, second, whether evidence was improperly excluded from which, with that already in the case, the jury might have determined such value.

The theory of defendant is shown by the request to go to the jury with which it supplemented the exception to direction of verdict for plaintiff:

"That the defendant in this action has proved that he was deprived from the use and possession of the premises between December, 1896, and May, 1897, at least twenty per cent., and that, the rent being fixed by the terms of the lease, the jury have the right to determine the amount of damages during that time."

There is some evidence in the record as to an interference with the enjoyment of the premises while certain construction work (the placing of new girders and trusses) was going on; but this was

prior to the assignment to Hess, and it is stated in the brief of plaintiff in error that no claim is made for it. The breach of covenant upon which defendant relies was the failure of the landlord to repair or to prevent a break in the cement floor of the cellar under the water-tight compartments behind the boilers. Water flowed in through the break. The effect of the influx of water is best described by the engineer (Loftus):

"The flow of water had the effect of retarding the draft to the point that we could not get the combustion in the combustion chamber to get the amount of steam to run the engines to the proper capacity. * * * The water it gradually comes and raises, and I have seen it raising from one inch to eleven inches, and going down as it raises, during a period of time that I did not take data of. * * * In December, 1896, and the three following months, I had trouble with it. The water appeared there from December, 1896, to May, 1897. In order to absorb this water, I had to be there, and get steam up with a dead fire, to siphon the water out—pump it out—to the best of my ability; and then I couldn't get it all out against the regular time, and the energy of the boilers—what pressure I had raised when I started the engine to give power to the plant—would die right down. During the time of this trouble the same power that was given prior thereto—before that time—couldn't be given. * * * The water entered the ash box, and rose to in the neighborhood of about six inches from the grate bars. * * * I was during the trouble absorbing the water as fast as I could to prevent it reaching the fire."

The witness English, employed in the press room, explains the effect of the reduction of steam pressure as follows:

"I was running a press of a certain make, and whenever the steam run low I had to shut down, and wait until the steam got up again, before I could run it, owing to the construction of the press. * * * There were fourteen presses, * * * all connected by one belting, so if one press stopped all the steam presses stopped. I couldn't tell you whether during the period covered by December, 1896, to May, 1897, those steam presses stopped, but various times they stopped. They stopped nearly every day for certain periods. When these presses stopped or slowed there was an effect on the work that was being done. The press that I was working would not register. The cylinder used to drop by not running at the proper speed, and, of course, I had to stop or spoil the work. Some of the work on my press went through spoiled, and that was occasioned by the fact that the steam run down, and slowed the press."

The testimony of these two witnesses gives a very clear description of the trouble, but it is wholly vague as to the extent of interference with the beneficial use of the premises. Bien, the secretary and general manager of the defendant company, testified that its business was lithographing, and gave a similar account of the break in the floor and the influx of the water. To an inquiry as to how much breakage there was and how much water came in he said that he could only answer on reports made to him in a general way.

"The leakage [said the witness] prevented us getting the full capacity of product from our steam machinery, and necessitated the additional expenditure for the purpose of securing it by working at night, or else by working a greater number of days for the purpose of turning out our work. * * * The working hours of the corporation were from 8 a. m. to 5:30 p. m. * * * We had only two boilers for the operation of our engine. We had at one time 14 steam presses, all of which were affected by it to so great an extent that in order to get a day's product we were compelled to work at night. Q. That is to say, they were affected about half their normal ca-

pacity; is that it? A. No, not that much; it was less than half. It varied. I have known at times they were affected probably half, sometimes stopped half, or may be 20 or 30 per cent., of their normal capacity. It was a variable quantity. * * * Q. The capacity [of the ,presses] was decreased how much? A. I have said it would vary sometimes,—sometimes half, and sometimes 20 per cent. or 30 per cent. It was irregular. Q. Average it. A. Well, during that time I should judge it affected our capacity 20 per cent. or 25 per cent. * * * [During this period] we suspended business so far as the running of our machinery was concerned for hours at a time, owing to the fact that we could not get proper steam power because of the defect. That was at odd times—not consecutively—between December, 1896, and May 1, 1897. * * * The suspension was all at different times,—different hours during the day. * * * We were compelled by reason of that suspension during the day to do the night work."

This additional evidence was not materially helpful to a solution of the question presented. The estimate of 20 per cent. or 25 per cent. was manifestly a vague guess, and was confined to the capacity of the presses, which occupied one floor and a half of premises consisting of four floors, with an annual rental for the whole of $10,-000. The jury would not have been warranted upon such testimony in finding the difference in value at 20 per cent. or 25 per cent. of the whole rent for the period in question. In the absence of further proof tending to show the rental value of the premises in the condition of disrepair, all effort to fix the "fair value" of the premises as they were would have been mere blind guesswork.

It is contended, however, that the court erred in excluding competent testimony, which, if admitted, would probably have made the operation of assessing damages an easy one. As has been already shown by reference to the authorities supra, the tenant is not entitled to recover for profits which he might have made, nor for losses which he might have avoided, but only for difference between the rental value of the premises as they were and as they would have been, taking into consideration the purposes for which the premises were to be used; or, as the trial judge expressed it, the damages are "the extent of the diminution of the value of the leased premises during the time when the repairs were not made." In the authorities above cited there was evidently some direct testimony as to rental value, but, in the federal courts at least, such direct testimony is not essential. The record does not show whether the attention of the trial judge was called to the case, but in Mining Co. v. Fraser, 130 U. S. 611, 9 Sup. Ct. 665, 32 L. Ed. 1031, the supreme court seems to have approved of liberality in the admission of evidence indirectly bearing upon the question of rental value. In that case defendant had undertaken to supply a roasting cylinder and a 20-stamp dry-crushing silver mill, with connected apparatus. They were put up at plaintiff's mine, and proved defective, subjecting plaintiff to great loss and damage by reason of the long period during which the mill could not be operated. The supreme court approved a charge that for the delay in the operations of the mill caused by defective machinery defendant was undoubtedly entitled as damages to the rental value of the mill for the period in question. There was no direct evidence of rental value. Defendant called one expert, to whom he put the question, but his answer was excluded on the ground that his past experience had been

wholly with gold mines. The character of the indirect evidence sufficiently appears in the following excerpt from the opinion of the supreme court:

"Evidence to show that the capacity of the mill was forty tons a day had been offered and received to prove the rental value of the mill, and perhaps very properly, as that might be a necessary preliminary fact leading up to the determination of its value for rental. But after the defendant utterly failed to show, by any admissible evidence, that there was any rental value for a mill of the kind, we think the court did not err in holding that such rental value could be shown by proving the value or the amount of ore delivered and milled."

The trial judge in Mining Co. v. Fraser charged that, "in the absence of all evidence as to the rental value, the jury were at liberty to add interest [at the statutory rate, 10 per cent.] on the investment," and that the "wages of the men employed in the mill whose time was lost while the mill was idle" were a proper element of damages, which charge the supreme court approved.

It will be quite apparent from the statement of facts in the case at bar that it is fairly to be inferred that there may be indirect evidence available to prove the rental value of the premises in their condition of disrepair. Indeed, it seems not improbable that without such evidence no expert could give an intelligent estimate of such rental value. Defendant did not vacate the premises, nor any part of them,—not even the locality where the water leaked. It still continued to maintain fires under its boilers to run its presses and to conduct its business, only for certain periods nearly every day subsequent to December, 1896, the running of the presses was suspended while the steam was diverted to the pump, or the rising water interfered with draft until its level was reduced. But despite these drawbacks defendant's work continued, and for each 24 hours the output was the same as it would have been if the establishment had run for regular hours (8 a. m. to 5:30 p. m.) unobstructed by water. This was accomplished by employing men to work at night, feeding the boilers, pumping the water, and running the presses, and the wages paid to those men for working after hours, in order to accomplish the work which, but for the leak, they could have done in working hours, would seem to be the exact measure of defendant's loss. The rental value of the premises in the condition in which they should have been kept may fairly be taken at that named in the lease, and it would seem that their rental value in the condition of disrepair would be the same amount, less the extra sum it would cost to do an equal amount of work in the premises, which, by reason of the lack of repair, were rendered less convenient for a manufacturing business. The plaintiff in error claims that he had such evidence, which was excluded by the court. It appears that after the witness Bien had testified that defendant was not able to have the full use and enjoyment of the premises during business hours between 8 a. m. and 5:30 p. m., and that it was compelled to use other means and other time for the use of the premises, in order to enable it to complete the work which it could have done within business hours if the premises were fit, he was asked this question: "Q. And were you compelled to pay and make greater outlays for wages for people working there at night for work that you were un-

able to do during the business hours by reason of the failure of the construction of the building?" This was objected to and excluded, exception being reserved. This question seems fairly to call for the very testimony which has been suggested, and under Mining Co. v. Fraser, supra, we think it should have been allowed. It may be doubtful, judging from the other evidence in the case, whether testimony sufficiently specific to be helpful would thereby have been elicited. The statements as to time and extent of interference were of the vaguest character, and it might be difficult to show how much of the wages for night work paid during the period in question was due solely to the interference of the water with work by day. So much of the wages for night work as was due to mere press of business, and would have been required even if the premises were in perfect order, should not be taken into consideration in fixing rental value of the unrepaired premises. It is, however, unnecessary to speculate on this subject. The question fairly called for testimony proper to be received upon the issues before the jury, and we think it was error to sustain the objection. The judgment is reversed, and a new trial ordered.