MONTANA MINING CO. v. ST. LOUIS MIN. & MILL. CO. OF MONTANA.

(Circuit Court of Appeals, Ninth Circuit. August 13, 1906.)

No. 1,240.

**1.** APPEAL AND ERROR—SECOND REVIEW—PRIOR DECISION AS LAW OF CASE.

Where the Circuit Court of Appeals, on a writ of error taken by the defendant, affirmed a judgment of the Circuit Court in favor of the plaintiff, but subsequently, on a cross-writ of error sued out by the plaintiff, reversed such judgment on different questions and ordered a new trial, although the effect of the later decision was to reverse the former, the opinions filed on the two hearings and not withdrawn constitute the law of the case. and questions therein determined will not be reconsidered on a subsequent writ of error from a second judgment.

[Ed. Note.—For cases in point, see vol. 3, Cent. Dig. Appeal and Error, §§ 4358–4368; vol. 13, Cent. Dig. Courts, § 340.]

**2.** SAME—REVIEW—AMENDMENT OF PLEADINGS.

Amendments to pleadings are within the discretion of a federal court under Rev. St. § 954 [U. S. Comp. St. 1901, p. 696], and error will not lie to the granting or refusal thereof.

**3.** TRIAL—EXCEPTIONS TO INSTRUCTIONS—RULE OF COURT.

Rule 58 of the Circuit Court for the District of Montana, which permits exceptions to the charge of the court or to the refusal of instructions requested to be taken after the jury have retired, but, if practicable, before the verdict has been returned, was intended to permit such course to be followed, where it would be in the interest of justice by avoiding the confusing of the jury or where further instructions were given in the absence of counsel, and not to permit exceptions generally to be taken after the close of the trial contrary to the settled rule of the federal courts; and where the judge, after instructing the jury but before sending them out. retired to his room with counsel and there heard and allowed the exceptions, the rule does not require him to afterward entertain or allow further exceptions.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, §§ 680, 681.]

**4.** WRIT OF ERROR—SUFFICIENCY OF EXCEPTIONS TO CHARGE.

Exceptions to the charge of the court in general terms, not sufficiently specific to call the attention of the court to the particular point claimed to be erroneous, cannot be considered by an appellate court.

**5.** MINES AND MINERALS—TRESPASS—REMOVAL OF ORE—ACTIONS—INSTRUCTIONS.

The charge of the court, in an action of trespass to recover the value of ore taken from a mining claim, considered as a whole and *held* to contain no error prejudicial to the defendant.

In Error to the Circuit Court of the United States for the District of Montana.

This was an action brought in the Circuit Court of the United States for the District of Montana by the St. Louis Mining & Milling Company, a Montana corporation, defendant in error, against the Montana Mining Company, Limited, a corporation organized under the laws of Great Britain, plaintiff in error, to recover damages for trespass upon a vein of mineral, the top or apex of which lies inside the surface lines of the St. Louis claim, but which vein in its downward course. departing from a perpendicular. crosses the vertical side lines of the St. Louis claim and enters beneath the surface of the adjoining claim owned by the Montana Company, where the trespass upon the vein by the Montana Company is charged to have been committed and the appropriation by that company of large quantities of valuable ore extracted from the vein.

The first paragraph of the second amended and supplemental complaint alleged the corporate character of the plaintiff and defendant.

147 F.—57

In the second paragraph of the complaint it was alleged that, at the times mentioned therein, the plaintiff was "the owner of, entitled to, and in the actual possession and occupation of, that certain quartz lode mining claim known as the 'St. Louis Quartz Lode Mining Claim,' and of the quartz, rock, and ore, and precious metals contained in any and all veins, lodes, and ledges of mineral-bearing rock through their entire depth, the tops or apexes of which lie within the surface lines of the said fractional portion of said St. Louis lode mining claim, although such veins, lodes, or ledges may so far depart from a perpendicular in their downward course as to extend outside of the vertical side line of the surface of the said St. Louis quartz lode mining claim."

The complaint contained a full description of this claim by monuments, courses, and distances, concluding with this exception : "Save and except that portion · thereof known as the 30-foot strip or compromise ground which belongs to and is a part and portion of what is known and designated as the Nine Hour lode mining claim."

In the third paragraph it was alleged "that the said defendant, Montana Mining Company, Limited, is and was the owner of what is known and designated as the 'Nine Hour Quartz Lode Mining Claim,' situate and being east of the said St. Louis lode mining claim, and including the 30-foot strip or compromise ground aforesaid, and that the discovery, location, and recordation of the said St. Louis lode mining claim and the United States patent therefor was made prior to the discovery, location and recordation and patent to the said Nine Hour lode mining claim."

In the fourth paragraph it was alleged: "That the dip of one of the veins having a portion of its top or apex inside of the surface location and patented ground of the said St. Louis mining claim is to the east and dips under and beneath the said Nine Hour lode mining claim, including the said 30-foot strip, or the compromise ground, which is a part and portion of the said Nine Hour quartz lode mining claim, which said portion of said vein has its top or apex within the said St. Louis mining claim as follows, to wit: Commencing at a projected parallel end line of said St. Louis quartz lode mining claim, at a point on the east side line thereof, between corners Nos. 1 and 2, extended vertically downward, whereat it passes through the hanging wall of said vein, lode, or ledge, at a point from which corner No. 1, being the · northeast corner of said St. Louis quartz lode mining claim, bears N. 12 deg. 15 min. E., distant 520 feet, where said hanging wall is disclosed at the surface by an upraise of said projected parallel end line, 5 feet west of the east side line of said St. Louis quartz lode mining claim; thence from where said projected parallel end line passess through said east sideline of said claim, and along the east side line of the said claim between corners Nos. 1 and 2, S. 21 deg. 15 min. W. 512.7 feet to a point, being the intersection of the said east side line of said St. Louis quartz lode mining claim, between corners Nos. 1 and 2, with the west line of the said 30-foot strip hereinbefore described; thence S. 50 deg. 50 min. W. 108 feet, and along the west line of the said 30-foot strip, to a projected parallel end line of said St. Louis quartz lode mining claim, extended vertically downward, which passes through the hanging wall of said vein at the surface and at the crossing of the said hanging wall with the west line of the said 30-foot strip. That it is also the owner of, in possession and entitled to the possession of, an additional portion of the said apex of said claim lying to the south of the southern point hereinbefore mentioned, a distance of 25 feet, whereat the foot wall of the said vein passes out of the east side line of the said St. Louis mining claim."

In the fifth paragraph it was alleged: "That, notwithstanding the right of the said plaintiff in the premises, said defendant, on or about the 30th day of June, 1893, knowingly, wrongfully, and unlawfully, by means of drifts, shafts, tunnels, and underground workings, entered into and upon that portion of the vein, lode, or lead so apexing within the said St. Louis mining claim, and commenced extracting quartz, rock, and ore therefrom, and removing the same, and converting it to his own use and benefit, and are now still removing and converting the same, which said quartz, rock, and ore is of the value of $200,000; on account thereof this plaintiff has been damaged in said sum. That since the filing of the original complaint herein and up to the

26th day of June, 1899, said defendant, Montana Mining Company, Limited, has extracted a large quantity of quartz, rock, and ore from the premises and veins above described and within the planes aforesaid, and converted the same and the minerals therein contained to their own use, of the value of $50,000, and to the damage of this plaintiff in said sum.

"Wherefore, plaintiff prays judgment for the said sum of $250,000, together with its costs and disbursements in this behalf expended."

A map or plat showing the point at which the said vein enters said St. Louis lode mining claim, as described in the complaint, and the point where the same departs therefrom upon the east line of said claim, is attached to the complaint, marked Exhibit "A," and made a part thereof. A copy of this map is annexed to this opinion for reference.

The last clause of the complaint relates to the damages alleged to have been sustained by the plaintiff after filing the original complaint and up to the 26th day of June, 1899, which were originally stated as being $50,000, and the total damages as $250,000. This clause was amended by leave of the court at the close of the last trial on June 30, 1905, so as to change the $50,000 therein mentioned to $400,000, making the entire claim for damages $600,000.

The Montana Mining Company answered this complaint June 30, 1899, admitting the allegations contained in paragraphs 1, 2, and 3, and setting up the defense of an estoppel by deed, as follows:

"And this defendant, further answering, says that the plaintiff is estopped from claiming any of the mineral found, or which may hereafter be found, in said 30-foot strip or compromise ground, for that heretofore, to wit, on or about the 7th day of March, A. D. 1884, one Charles Mayger, who was then and there the predecessor in interest of plaintiff, made, executed, and delivered to William Robinson, James Huggins, and Frank P. Sterling, who were and are the predecessors in interest of this defendant, a bond for a deed, wherein and whereby he covenanted and agreed to convey the said 30-foot strip or compromise ground to the predecessors in interest of this defendant, or their assigns, with all the mineral therein contained, a copy of which said bond is hereto attached, marked Exhibit 'A,' and made a part of this answer; that thereafter and after the said Charles Mayger had obtained a United States patent for the whole of said St. Louis lode mining claim, including said 30-foot strip or compromise ground, the said Mayger, in order to cheat and defraud this defendant, assumed to convey the said compromise ground to the above-named plaintiff; that thereafter this defendant demanded of and from the said plaintiff and from the said Mayger a deed for the said compromise ground in accordance with the terms and provisions of the bond aforesaid, and the said defendant and the said Mayger having refused and declining to make, execute, or deliver such a deed, this defendant thereafter, and on or about the 6th day of September, A. D. 1894, commenced an action in the district court of the First judicial district of the state of Montana, within and for the county of Lewis and Clarke, wherein this defendant was plaintiff and the above-named plaintiff, together with the said Charles Mayger, were defendants, to compel the specific performance of the said bond for a deed hereinbefore mentioned and set forth; that thereafter such proceedings were had in said action as that on the 1st day of June, A. D. 1895, judgment was duly made and entered therein in favor of this defendant, the plaintiff therein, and against the plaintiff, defendant in said action, whereby, among other things, it was ordered, adjudged, and decreed that the said bond hereinbefore mentioned be specifically performed, and that the defendant, the above-named plaintiff, make, execute, and deliver to this defendant a good and sufficient conveyance in fee simple absolute, free from all incumbrances, for the premises mentioned and described in the complaint in said action and in the bond hereinbefore mentioned; that, in pursuance of said judgment, order, and decree, the said plaintiff, on or about the 1st day of July, A. D. 1895, made and executed a deed to this defendant of and for the said premises and of all the mineral therein contained; and thereafter the said deed was duly delivered to this defendant, a copy of which said deed is hereunto annexed, marked Exhibit 'B,' and made a part of this answer. And this defendant avers that in and by the said proceedings and the said deed the said plaintiff is estopped from claiming any part of the said compromise ground or 30-foot strip aforesaid, or any mineral contained therein.

"Wherefore, having fully answered, the defendant prays to be hence dismissed without day, and for its costs in this behalf expended."

To this answer the plaintiff filed a replication in which it was denied that plaintiff was estopped for any of the causes or reasons set up in the said answer, or any other cause or reason, from claiming any of the mineral found; or that might be at any time thereafter found, in said 30-foot strip or compromise ground. Plaintiff admitted the execution of the bond as stated in the answer, and averred that the same was executed and made on account of an application of the said Mayger for a patent to the said St. Louis

lode mining claim, and on account of an adverse claim interposed by the said defendant's predecessor in interest of said 30-foot strip or compromise ground as being a part of what was known as the Nine Hour quartz lode mining claim. Plaintiff admitted that the said Mayger agreed to convey said 30-foot strip or compromise piece of ground, with all the minerals therein contained, to the predecessor in interest of the said defendant, and averred that the said claim of plaintiff comprised no minerals contained in or beneath said 30-foot strip or compromise ground, except such as were contained in leads, lodes or ledges which had their tops or apexes within the St. Louis quartz lode mining claim, exclusive of said 30-foot strip or compromise ground. The plaintiff further averred that it was seeking to recover only such quartz, rock, or ore, and the value thereof, and the damages for the removal and conversion of the same, as comprised lodes, leads, or ledges having their tops or apexes within the boundary lines of the said St. Louis lode mining claim, exclusive of said 30-foot strip or compromise ground.

Plaintiff admitted that Mayger obtained a patent for the said 30-foot strip or compromise ground, but denied that any conveyance was made by him to plaintiff to defraud any one, and averred that all matters in relation thereto had been concluded by the judgment of the court and the deed mentioned in defendant's answer executed in pursuance thereof; that the 30-foot strip or compromise ground was at all times a part and portion of the quartz lode mining claim known as the Nine Hour claim; that the same was never a part or portion of the St. Louis quartz lode mining claim; that in the action in the district court of the First judicial district of the state of Montana in and for the county of Lewis and Clarke, wherein the defendant was plaintiff and plaintiff and Charles Mayger were defendants, the action was based upon the agreement mentioned in said answer, and was brought for the purpose of compelling the defendants therein in accordance with said agreement to execute and deliver to the plaintiff therein a good and sufficient deed for the premises known as the 30-foot strip or compromise ground; that the court found and determined, as a matter of fact, that the said 30-foot strip or compromise ground was at all times a part of the said Nine Hour lode mining claim, and was, by the parties to said agreement, agreed to be a part thereof, and that the said agreement was made and given for the purpose of settling and determining and fixing the boundary line between the said Nine Hour lode mining claim and the St. Louis lode mining claim, the boundary of which claims had been, and was at the time of the execution of said agreement, in conflict, and concerning which a controversy then existed between the parties to said agreement; that the deed mentioned in the answer is the deed which the court adjudged in said action should be executed for the purpose of performing the agreement above referred to; that said deed conveyed no other title than such as was attached and incident to the said 30-foot strip or compromise ground, and that the minerals therein contained were intended to comprise and did comprise all such minerals as were contained in veins, lodes, or ledges having their tops or apexes inside of said 30-foot strip.

The controversy between the plaintiff and the defendant, as stated in these pleadings, was whether the deed executed and delivered by the plaintiff on the 1st day of July, 1895, conveying the 30-foot strip or compromise ground to the defendant, included the extralateral right of a vein apexing within the boundaries of the St. Louis claim but passing on its downward course beyond the vertical side line of such claim into the 30-foot strip or compromise ground, and if this deed did not include such extralateral right, then the extent of such vein and the extralateral right in the 30-foot strip or compromise ground, that is to say, where as in this case the vein has a width of 25 feet and crosses the vertical side line at an angle, whether the extralateral right ceases at the point where a part of the apex of the vein represented by the hanging wall crosses the side line, or whether the right adheres to the vein until its entire apex represented by the foot wall has crossed the side line of the claim into the adjoining ground. The vein described in these pleadings as having its apex within the surface location of the St. Louis mining claim is shown on the map or plat attached to the complaint. The apex of the vein, as described in paragraph 4 of the complaint, commences on a projected parallel end line "at a point from which corner

No. 1, being the northeast corner of said St. Louis quartz lode mining claim, bears N. 12 deg. 15 min. E., distant 520 feet, where said hanging wall is disclosed at the surface by an upraise of said projected parallel end line 5 feet west of the east side line of said St. Louis quartz lode mining claim"; thence the vein continues within the surface boundaries of the St. Louis mining claim in a general southerly direction to the line of the 108-foot plane, which designates the point where the hanging wall of the vein crosses the vertical side line of the St. Louis claim and the line of the 133-foot plane designates the point where the foot wall of the same vein crosses the same side line. In the course of the trial in the Circuit Court this vein was designated by the witnesses as the Drumlummon vein, and it has since been known in the proceedings by that name.

Upon the issues presented by the pleadings the case was tried by the court and a jury, and on August 12, 1899, a verdict was rendered in favor of the plaintiff for $23,209. On August 16, 1899, a judgment was entered thereon. The Montana Company, being dissatisfied with this judgment, sued out a writ of error October 7, 1899, and brought the case to this court for review.

It was contended on behalf of the Montana Company as grounds for reversal of the judgment, among other things, (1) that the complaint did not state a cause of action; and (2) that by the execution of the bond, the entry of the judgment enjoining specific performance of the conditions of the bond, and the execution of the deed of conveyance mentioned in the answer, the St. Louis Company was estopped from claiming any ore in the 30-foot strip or compromise ground. This court held that the allegations of the complaint that the plaintiff was the owner and in possession of the St. Louis claim and of the ore and precious metals contained in any and all veins, lodes, ledges, and mineral-bearing rock through their entire depth, the tops or apexes of which were within the surface lines of the St. Louis claim; that the strip of land beneath the surface of which the ores in controversy were mined was located east of the east side line of said claim; that the dip of one of the veins having a portion of its apex inside the surface lines of the St. Louis claim was to the east and dipped under and beneath the 30-foot strip of the Nine Hour claim, and that from this vein so apexing within the St. Louis claim and extending beneath the Nine Hour claim, the ores in controversy had been mined by defendant—were sufficient, in the absence of a demurrer, to support a judgment in favor of the defendant for the conversion of such ores. This court also held that the conveyance by the St. Louis Company to the Montana Company of the land in controversy, in pursuance of a decree of court, had no other effect than to fix the surface boundary of the side line between the two claims in accordance with the original contention of the grantee, and did not deprive the grantor of any extralateral right under the ground so conveyed. In accordance with this opinion the judgment of the Circuit Court was affirmed May 14, 1900. 102 Fed. 430, 42 C. C. A. 415.

At the trial in the Circuit Court the St. Louis Company was restricted by the court to the damages it sustained by reason of the trespass of the defendant upon that portion of the Drumlummon vein under the 30-foot strip or compromise ground and under the Nine Hour claim between lines projected downward along the dip of the vein from the 520-foot plane and the 108-foot plane as represented on the map or plat attached to the complaint. But plaintiff offered to prove in addition the amount of ore taken by defendant from that portion of the vein, the apex of which was divided by the western boundary of the 30-foot strip or compromise ground between points represented on the same map or plat as the 108-foot plane and the 133-foot plane, which part of the vein on its downward course also dipped beneath the 30-foot strip or compromise ground and under the Nine Hour claim. The court refused to admit this testimony, and the value of the ore taken from this point of the Drumlummon vein was not included in the judgment for the plaintiff. The plaintiff, being dissatisfied with the judgment because of the ruling of the court with respect to this testimony and the omission from the judgment of the value of the ore taken from this part of the vein, sued out a cross-writ of error January 30, 1900, and the case was brought here for review upon that question. This court, in deciding this feature of the case,

stated the question to be: "When a secondary or accidental vein crosses the common side line between two mining locations at an angle, and the apex of the vein is of such width that it is for a given distance partly within one claim and partly within the other, to whom does such portion of the vein belong?" After discussing the question, the court said: "Upon the question first propounded in this opinion, therefore, the only deduction which can be made from the foregoing views is that inasmuch as neither statute nor authority permits a division of the crossing portion of the vein, and the weight of authority favors the senior locator, the entire vein must be considered as apexing upon the senior location until it has wholly passed beyond its side line. It follows that the court below erred in its refusal to admit the evidence offered as to the value of the ores taken from the Drumlummon vein on its dip between the planes designated as the 108-foot and 133-foot planes, and the cause is therefore remanded for a new trial as to damages alleged and recovery sought for conversion of ore between the planes indicated." In accordance with this opinion, the judgment of the Circuit Court was reversed October 8, 1900. 104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725.

To review these two separate judgments of this court the Montana Company sued out two writs of error from the Supreme Court of the United States. In that court both writs of error were dismissed, on the ground that the judgment of this court reversing the judgment of the Circuit Court in the second case operated to reverse the prior judgment of affirmance in the first case, and there being no final judgment in the case, the jurisdiction of the Supreme Court did not obtain. 186 U. S. 24, 22 Sup. Ct. 744, 46 L. Ed. 1039. Upon the coming down of the mandate from the Supreme Court, this court, October 8, 1902, entered a judgment that the judgments theretofore entered be vacated and set aside, and in lieu thereof it was ordered and adjudged that the judgment of the Circuit Court be reversed with costs, and the cause remanded to the said Circuit Court for a new trial, and a mandate was issued accordingly. Upon the new trial before the court and a jury, the court followed the law as declared by this court in the two opinions rendered in the case, and a verdict was returned in favor of the plaintiff for $195,000, upon which a judgment was entered by the court. To reverse this judgment, the case is here upon writ of error.

Charles J. Hughes, William Wallace, W. E. Cullen, and W. E. Cullen, for plaintiff in error.

Bach & Wight, John B. Clayberg, Arthur Brown, and M. S. Gunn, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts). It is contended by the plaintiff in error that the judgment of this court entered October 8, 1902, set the entire case at large, and upon the second trial relieved it from the rule prevailing in the United States courts that whatever has been decided on one appeal or writ of error cannot be re-examined on a second appeal or writ of error brought in the same suit.

In appellate proceedings the rule was stated by the Supreme Court in Browder v. McArthur, 7 Wheat. 58, 5 L. Ed. 397, as follows:

"It was too late to grant a rehearing in a cause, after it had been remitted to the court below, to carry into effect the decree of this court, according to its mandate; and that a subsequent appeal from the Circuit Court, for supposed error in carrying into effect such mandate, brought up only the proceedings subsequent to the mandate, and did not authorize an inquiry into the merits of the original decree."

In Sibbald v. United States, 12 Pet. 488, 492, 9 L. Ed. 1167, a motion was made to reform a mandate issued by the court at a pre-

vious term so as to conform the same to the opinion given by the court at that time. In granting the motion the court stated its opinion of the course prescribed by law for it to take after final action upon a case brought within its appellate jurisdiction. The court said:

"Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case, and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; nor give any other or further relief; nor review it upon any matter decided on appeal for error apparent; nor intermeddle with it, further than to settle so much as has been remanded."

In Supervisors v. Kennicott, 94 U. S. 498, 24 L. Ed. 260, the Supreme Court, on a former appeal from the Circuit Court for the Southern District of Illinois, had decided that the mortgage in contro- versy in the case was valid in favor of bona fide holders of the bonds it was given to secure, and that the complainants were entitled to a decree for the amount of the bonds held by them. The direction of the Supreme Court, as stated in the opinion in that case, was that the judgment of the Circuit Court must be reversed and a new trial had. In accordance with this direction the Circuit Court upon the new tria appears to have opened up the case for a further hearing upon issues presented and decided upon the first appeal. On the second appeal the Supreme Court refused to consider these questions, referring to the fact that technically there could be no "new trial" in a suit in equity, and holding that the mandate of the court was to be interpreted according to the subject-matter of the proceedings before the Supreme Court, and if possible so as not to cause injustice; that it was proper to inquire what must have been intended by the use of the term "new trial" in the decree, since it could not have its ordinary meaning, and for the purpose resort might be had to the opinion delivered at the time of the decree, citing the case of West v. Brashear, 14 Pet. 51, 10 L. Ed. 350. In refusing, on the second appeal, to consider questions decided on the first appeal, the court said:

"These questions are, therefore, no longer open; for it is settled in this court that whatever has been decided here upon one appeal cannot be re-examined in a subsequent appeal of the same suit. Such subsequent appeal brings up for consideration only the proceedings of the Circuit Court, after the mandate of this court."

In Roberts v. Cooper, 20 How. 481, 15 L. Ed. 969, the case was at law, and was in the Supreme Court on a writ of error. On a previous writ of error the case had been remanded for a new trial (Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338), and it was contended there, as it is here, that on a review of the case the party is to be heard at large both as to the law and fact. With respect to this contention the court said:

"On the last trial the Circuit Court was requested to give instructions to the jury contrary to the principles established by this court on the first trial, and nearly all the exceptions now urged against the charge are founded on such refusal. But we cannot be compelled, on a second writ of error in the same case, to review our own decision on the first. It has been settled by the decisions of this court that, after a case has been brought here and decided, and a mandate issued to the court below, if a second writ of error is sued out,

it brings up for revision nothing but the proceedings subsequent to the mandate. None of the questions which were before the court on the first writ of error can be reheard or examined upon the second. To allow a second writ of error or appeal to a court of last resort on the same questions which were open to dispute on the first, would lead to endless litigation. In chancery, a bill of review is sometimes allowed on petition to the court; but there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate of chances from changes in its members."

In Republican Min. Co. v. Tyler Min. Co., 79 Fed. 733, 25 C. C. A. 178, this court had before it the question whether the owner of a mining claim was deprived of the extralateral right pertaining to a vein apexing within the boundaries of his claim because the vein, although entering the claim through an end line and running its course lengthwise nearly parallel with the side lines for the greater part of the length of the claim, passes out of the claim across a side line before it reaches the other end line. The question had been decided by the court, upon a previous writ of error, in favor of the extralateral right claimed by the owner of the vein, and accordingly the court held that, where a case has been brought before an appellate court and there decided, a second writ of error brings up nothing for review but the proceedings subsequent to the mandate; that the appellate court is not bound to consider any of the questions which were before the court on the first writ of error. In the case of the Mutual Reserve Fund Life Ass'n v. Beatty, 93 Fed. 747, 35 C. C. A. 573, this court again referred to this rule in the following language:

"It is clear that the decision of the Circuit Court of Appeals upon the former writ of error is the law of the case, and, so far as the court has considered the questions at issue, they must be deemed to be res judicata, and not open for review at this time."

In Thompson v. Maxwell Land Grant Co., 168 U. S. 451, 456, 18 Sup. Ct. 121, 42 L. Ed. 539, the Supreme Court stated the rule with respect to prior decisions and the authority of the opinion of the court in determining what has been decided, as follows:

"It is the settled law of this court, as of others, that whatever has been decided on one appeal or writ of error cannot be re-examined on a second appeal or writ of error brought in the same suit. The first decision has become the settled law of the case. * * * We take judicial notice of our own opinions, and although the judgment and the mandate express the decision of the court, yet we may properly examine the opinion in order to determine what matters were considered, upon what grounds the judgment was entered, and what has become settled for further disposition of the case."

In the present case this court, on May 14, 1900, entered a judgment of affirmance in accordance with the opinion of the court in the case entitled, in this court, "Montana Min. Co. v. St. Louis Min. & Mill. Co." (102 Fed. 430, 42 C. C. A. 415), and on October 8, 1900, it entered a judgment of reversal in accordance with the opinion of the court in the case entitled, in this court, "St. Louis Min. & Mill. Co. v. Montana Min. Co." (104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725), both cases being writs of error from the same judgment in the court below.

The Supreme Court of the United States was of the opinion that the judgment in the last case operated to reverse the prior judgment of affirmance in the first case (186 U. S. 24, 22 Sup. Ct. 744, 46 L. Ed. 1039). In accordance with this opinion this court entered a single judgment of reversal on October 8, 1902, and directed that a new trial be had. The mandate directed "that such new trial and further proceedings be had in said cause in accordance with the judgment of this court * * * and according to right and justice and the law of the United States ought to be had."

There is certainly nothing in this judgment to indicate a purpose on the part of the court to set aside its decisions rendered in the case. On the contrary, the fact that these decisions were not withdrawn or recalled and the case set at large indicates that the court has no intention of doing so. The decisions were allowed to stand as the opinions of this court upon the issues presented by the writs of error, and hence became the law of the case. The fact that the mandate does not contain a reference to these opinions does not determine that they are without authority.

In the case of Empire State-Idaho Min. & Dev. Co. v. Hanley, 136 Fed. 99, 66 C. C. A. 87, this court answered a similar objection in the following language:

"The fact that the views of the court so expressed in the opinion are not contained in the mandate which issued to the lower court renders them no less conclusive as the law of the case"—citing Thompson v. Maxwell Land Grant Co., 168 U. S. 451, 18 Sup. Ct. 121, 42 L. Ed. 539.

We think that all questions considered and determined in our former decisions upon prior writs of error have become the law of the case; that the lower court was right in refusing to disregard such decisions; and that this court is without authority, upon this last writ of error, to reconsider the questions so determined. We, therefore, pass over the assignments of error relating to questions which appear to have been determined in our previous decisions and come to the new questions raised upon the last trial.

After the taking of testimony had been concluded, the plaintiff moved the court for leave to amend the ad damnum clause of the complaint so as to change the allegation claiming $50,000 damages to an allegation claiming $400,000 damages. To this amendment the defendant objected, and the court overruled the objection. The ruling is assigned as error. Amendments to pleadings are within the discretion of the court, and error will not lie to the granting or refusal thereof. Section 954, Rev. St. [U. S. Comp. St. 1901, p. 696]; Chapman v. Barney, 129 U. S. 677, 9 Sup. Ct. 426, 32 L. Ed. 800.

The remaining assignments of error relate to the charge of the court to the jury. It appears from the transcript of record that, during the argument of respective counsel, the court directed the attention of counsel on both sides to rule 58 of the court and the decision of this court in Mountain Copper Company v. Van Buren, 133 Fed. 1, 66 C. C. A. 151, and Harvey v. Tyler, 2 Wall. 328, 17 L. Ed. 871. concerning instructions to juries. These decisions require that exceptions to instructions, to be available on writ of error,

must be taken to each instruction specifically, and not to the instructions as a whole, and that the record must show that they were taken and the points of exception designated while the jury were at the bar; that it is improper practice to permit formal exceptions to be then noted and the specifications of objections to be supplied in the record later, the object of the rule being that the attention of the trial court shall be called to the precise point to which exception is taken while it may be remedied by the court and before the case is finally submitted to the jury. Rule 58 of the Circuit Court for the District of Montana appears to be the same as rule 58 of the Circuit Court for the Northern District of California, which permits exceptions to the charge or a refusal to give, as a part of such charge, instructions requested in writing, to be taken by any party by stating to the court, after the jury have retired to consider their verdict, and if practicable before the verdict has been returned, that such party excepts to the same, specifying by numbers of paragraphs, or in any other convenient manner, the parts of the charge excepted to and the requested instruction, the refusal to which is excepted to.

The record of the proceedings of the court with respect to instructions to the jury is as follows:

"After delivering the charge, the court, before the going out of the jury for the considering of their verdict, requested counsel to submit any exceptions they might have to the charge, and to the instructions requested and given or refused. Thereupon, before the jury retired, counsel for both parties retired to the judge's room with the charge of the court, which was in writing, in their possession, and prepared in writing such objections and exceptions to the charge and the several parts thereof, and to the refusals to charge, as they desired, and thereafter in court the defendant presented the following exceptions and none other, which were then and there received by the court, and signed and allowed before the jury retired."

The exceptions were as follows:

"The defendant, immediately after the court had charged the jury and before they had left their seats or retired to consider of their verdict, submitted in writing to the court its objections and exceptions to the said charge, and portions thereof, which objections were then and there severally overruled, and defendant then and there duly excepted. The defendant also submitted in writing herein its objections and exceptions to the charges offered by the defendant and refused, which objections were likewise severally overruled, and defendant then and there duly excepted.

"Said objections and exceptions are respectively as follows, to wit."

Then follow 40 exceptions to the refusal of the court to give instructions as requested, and 16 exceptions to instructions given by the court. This bill of exceptions concludes as follows:

"Notice of the foregoing exceptions are given by the defendant and are received and considered by the court before the going out of the jury on this 6th day of July, 1905.

"[Signed]                       William H. Hunt, Judge."

The verdict of the jury was returned July 7, 1905. The record contains a second bill of exceptions relating to instructions to the jury, proposed after the trial had closed, as follows:

"In defendant's proposed bill of exceptions, upon July 31, 1905, the defendant stated its exceptions to the charge given by the court, in the following language."

Then follow 10 objections to specific instructions of the court and a statement with respect to each objection that the court overruled the objection and gave the instruction. This part of the bill of exceptions concludes as follows:

"The court declined to allow the exceptions as stated in the proposed bill of defendant, and directed that the bill incorporate the exceptions and objections made and allowed before the jury retired, to which ruling of the court the defendant then and there duly excepted."

Then follows 11 instructions which the defendant requested the court to charge the jury and which the court refused, and the defendant excepted. This second bill of exceptions was signed by the judge and made a part of the record August 14, 1905.

The plaintiff in error contends that this second bill of exceptions, proposed after the close of the trial, may be taken and considered as a part of the bill of exceptions in the case, under rule 58 of the Circuit Court. In United States v. Carey, 110 U. S. 51, 3 Sup. Ct. 424, 28 L. Ed. 67, the Supreme Court said:

"The rule is well established and of long standing that an exception, to be of any avail, must be taken at the trial. It may be reduced to form and signed afterwards, but the fact that it was seasonably taken must appear affirmatively in the record by a bill of exceptions duly allowed or otherwise."

In Beaver v. Taylor, 93 U. S. 46, 55, 23 L. Ed. 797, 798, the court said:

"One object of an exception is to call the attention of the circuit judge to the precise point as to which it is supposed he has erred, that he may then and there consider it and give new and different instructions to the jury, if, in his judgment, it should be proper to do so."

In Thiede v. Utah Territory, 159 U. S. 510, 522, 16 Sup. Ct. 62, 40 L. Ed. 237, the verdict in the lower court was returned on October 21st. On November 2d counsel for defendant came into court and sought to save other exceptions to the charge. The court noted those exceptions but declined to make any ruling on them. The Supreme Court said: "Obviously, they were too late."

It has been found that the proceedings connected with the taking of exceptions to the charge of the court in the hearing of the jury has sometimes caused the jury to form a wrong impression of the charge and its purpose. It has also frequently happened that after the jury has retired to deliberate upon their verdict they have returned into court and requested further instructions, and the court, in the absence of counsel, has given such instructions. Merchants' Exchange Bank v. McGraw, 76 Fed. 930, 936, 22 C. C. A. 622. Rule 58 of the Circuit Court was intended to provide for those two situations and cannot be construed as establishing a method of procedure in conflict with the long line of decisions of the Supreme Court of the United States, from Walton v. United States, 9 Wheat. 651, 6 L. Ed. 182, to Thiede v. Utah, supra; besides, the language of the rule does not justify such a construction. It was manifestly intended to permit exceptions to be

taken to the instructions or the refusal to give instructions after the jury had retired to consider their verdict where such a course would be in the interest of justice, and where instructions were given by the court, in the absence of counsel, to permit exceptions to be taken as soon as practicable thereafter.

In the present case, after the judge had instructed the jury, instead of sending the jury out, the judge retired to his chambers and there heard the exceptions to the charge out of the hearing of the jury. This action was in accordance with the spirit and purpose of the rule. It gave the parties ample opportunity to take exceptions without confusing the jury with the proceedings connected with the action of the court in ruling upon a multitude of exceptions; but it was not intended by this permission, and the further provision that exceptions should be taken to the charge if practicable before the verdict had been returned, to give counsel the general permission to take exceptions to the charge after the close of the trial. Such permission would be contrary to the rule of procedure declared by the Supreme Court and by this court in numerous cases. But, conceding that this rule was subject to the construction contended for by plaintiff in error, it was subject to another well-established rule, that it is always in the power of a court to suspend its own rules or to except a particular case from their operation whenever the purpose of justice requires it. United States v. Breitling, 20 How. 252, 15 L. Ed. 900. This was manifestly such a case, and the action of the court is to be commended rather than made a subject of criticism.

This second bill of exceptions cannot, therefore, be considered. It was not submitted in accordance with the instructions nor in accordance with the rule of the court.

In the first bill of exceptions many of the objections to the instructions of the court were noted in general terms, as, for example, that the instruction "does not correctly state the law," or is "contrary to law," or is "not sufficiently guarded," or is "misleading," or "inapplicable." These objections were not sufficiently specific and direct to call the attention of the court to the specific point claimed to be erroneous. They did not furnish the court with the information necessary to enable it to correct inaccurate, inadvertent or misleading expressions, if any such there were. Merchants' Exchange Bank v. McGraw, 76 Fed. 930, 936, 22 C. C. A. 622. Objections are also now urged to instructions which were not noted or presented to the court below in any form. None of these objections can now be considered. In paragraph 5 of the instructions the court instructed the jury as follows:

"The plaintiff must show a right of recovery. This applies as well to the question of extralateral rights on the Drumlummon vein in dispute and upon its discovery vein, as the question of damages. But if the plaintiff makes a prima facie case by its evidence, and the presumptions of law applicable to the situation, that it has extralateral rights to its discovery vein, between the 520 and 133 foot planes, and therefore to that part of the Drumlummon vein in dispute, then the defendant must overcome this prima facie case and these presumptions by showing, to the satisfaction of the jury, that plaintiff has no extralateral rights."

To this instruction the plaintiff in error interposed the objection (1) that the burden of proof never shifts as to extralateral rights for a

discovery vein, and (2) that whoever has the burden is only required
to establish the fact by a fair preponderance of the evidence, and (3)
that this charge does not correctly state the law. The court after-
ward instructed the jury, in paragraph 7, as follows:

"It is conceded on this trial that the vein from which the ore was extracted
has its apex within the surface boundaries of the St. Louis quartz lode
mining claim, between the 520-foot plane and the 133-foot plane, which have
been described to you in the evidence; but the defendant insists that the St.
Louis quartz lode mining claim is not entitled to extralateral rights on the
Drumlummon vein from which the ore was taken, and therefore, that plain-
tiff is not the owner of the ore extracted by defendant. The vein from which
said ore was extracted is admitted to be a secondary or incidental vein of
the St. Louis claim."

There was no exception taken to this latter instruction. It was
strictly in accordance with the pleadings and the facts stated were ad-
mitted facts in the case, and further than this, the previous decisions
of this court had determined that the St. Louis Company owned the
mineral in this vein within the planes described, and such determina-
tion had become the law of the case.

The fifth paragraph of the instructions of the court, to which objec-
tion is urged, could not, therefore, prejudice any right of the plaintiff
in error. If the instruction is open to any criticism, it would seem
to be that the extralateral rights of the discovery vein were not in
issue in the case. The only question in controversy under the plead-
ings was whether the St. Louis Company had conveyed the extralat-
eral rights of the Drumlummon vein to the Montana Company by the
deed of July 1, 1895, and if it had not, the damages sustained by the
St. Louis Company by reason of the trespass of the Montana Com-
pany upon that vein. The first of these questions had been deter-
mined by this court in favor of the St. Louis Company, and the second
question was being determined in the trial then in progress. Whether
the plaintiff had made a prima facie case of extralateral rights to
either the discovery or Drumlummon veins was therefore immaterial.
It had been determined upon the admitted facts in the case that the
Drumlummon vein had such extralateral rights, and that that was all
that was necessary to be established to entitle the plaintiff to recover.
The instruction that "the defendant must overcome this prima facie
case and these presumptions by showing to the satisfaction of the jury
that plaintiff has no extralateral rights," was also immaterial and did
the plaintiff in error no injury, even if open to the objections urged
against the instruction.

In paragraph 8 the court instructed the jury as follows:

"If you find that the course or strike of the discovery vein in the St. Louis
mining claim, as disclosed at the point of discovery or elsewhere, is generally
lengthwise of the location, the presumption arises that the discovery vein so
located extends through the entire length of such location.

"And I further charge you that the burden is upon the defendant to over-
come this presumption to your satisfaction. It is not necessary, in order to
give plaintiff extralateral rights on that part of the Drumlummon vein
which apexes within the surface boundaries of the St. Louis claim, between the
520 and 133 foot planes, that the discovery vein of the St. Louis claim should
pass through either end line of said claim, but it is sufficient to give such rights

if the discovery vein, in its course or strike, passes through the ground within the St. Louis claim between such planes generally lengthwise of the claim."

To this instruction the defendant excepted, on the ground that it was contrary to the law in that no presumption whatever arises with reference to the course of the discovery vein.

The answer to the objection urged against paragraph 5 of the instructions is a sufficient answer to this objection. If, however, the course, length, and dip of the discovery vein in the St. Louis claim were facts material to the question of the extralateral rights of the Drumlummon vein between the 520 and the 133 foot planes, then the court covered the entire subject in paragraph 9 of the instructions, as follows:

"And if you find that the discovery vein (or veins so connected with it as to be part of the system of veins at the discovery point) runs lengthwise of the St. Louis claim between its side lines, and extends from the 520 to the 133 foot plane, and dips easterly, then plaintiff would be entitled to extralateral rights for that vein (or those veins) and to the like extralateral rights for all other veins having their apexes within the same limits, and running in the same general direction."

To this instruction no exception was taken.

In paragraph 25 the court instructed the jury as follows:

"When you are told in this charge that the burden of proof upon any issue is upon either party to this action, you are to understand that such party must present evidence for your consideration which preponderates over the evidence of the other party upon that issue; and if, after due consideration of all the evidence introduced by the party having the burden of proof, it does not preponderate in his favor, but that the evidence of each party upon the issue is equal in your judgment, it is your duty to find such issue against the party having the burden of proof, under the instructions."

To this instruction no exception was taken.

All these instructions must be taken together. They qualify each other, and, considered in that light, we do not think plaintiff in error was prejudiced by the instructions as to the burden of proof as given in paragraphs 5 and 8 under any view of the case, either as to the law or the facts on which the case was submitted to the jury. The use of the word "satisfaction" in paragraphs 5 and 8 of the instructions is specifically objected to on the ground that it required the plaintiff in error to furnish a higher degree of proof than the law demands. What has been said about the burden of proof is applicable to this objection. Assuming that the word is objectionable, it did not injure the plaintiff in error, as it related to a question not in issue on that trial.

The plaintiff in error contends that the instructions concerning the measure of damages were erroneous. The instructions objected to are contained in paragraphs 11, 17, 18, 19, and 32 of the instructions of the court. To paragraph 11 no exception was taken at the trial. In paragraph 17 of the instructions, the court instructed the jury as follows:

"If, from the evidence before you. it appears to your satisfaction that, since the commencement of this action and the service of summons upon the defendant, it has taken out and converted to its own use quartz, rock, and ore, within the planes described in the complaint, from said vein, lead, or lode,

belonging to the plaintiff, under the instructions given you, then the acts of said defendant, to the extent of said trespass, cannot be regarded as done without notice and knowledge of said plaintiff's title and claim. Under such circumstances the trespasser may not be permitted to benefit by its trespass, and if, by reason of such trespass, it has placed the evidence within its control, or left it so that the extent of the injury to the plaintiff is uncertain, then it is your duty to see that the real owner and innocent party does not suffer from the trespass, and award to it such damages as will afford it just compensation for the injuries it has sustained."

To this instruction the defendant excepted "for that it is contrary to law, is not sufficiently guarded, and is misleading to the jury." Plaintiff in error contends that in this instruction the court instructed the jury that, as to all ore dug after the commencement of the suit, it was charged with knowledge and notice of the plaintiff's title, and therefore could not be an innocent or other than a willful trespasser. The instruction does not appear to be open to such an interpretation. It was plainly intended to direct the attention of the jury to a question of evidence and to instruct the jury that after the defendant had received notice and knowledge of plaintiff's claim of title to the ore in the vein in controversy the defendant should not be permitted to benefit by its trespass by placing or leaving evidence of the extent of such trespass uncertain. In other words, after notice it was the duty of the defendant to keep a correct record of the quantity and value of the ore extracted, and, failing to do so, it was not to be benefited by this failure; the jury was to award just compensation for the damages sustained by the plaintiff by reason of the trespass. If this is not the correct interpretation of the instruction, it was the duty of the plaintiff in error, in taking its exception at the trial, to point out the precise point of the objection, that the court might have made the instruction clear and direct with respect to the matter involved. Failing to do this, the instruction is not now open to the objection urged against it.

Paragraph 18 of the instructions was as follows:

"The defendant, even if an innocent trespasser, is not entitled to claim any mitigation of damages for the money expended in the running of levels, sinking shafts, or development work, except to the extent actually necessary to the extraction of the ore in controversy. It is held liable under the law for the actual value of the ore, if the trespass was innocent, less the reasonable cost of extracting the ore, raising it to the surface, transporting it to the mill, and reducing or milling it. Defendant cannot charge, in making the amount of these deductions, any extraordinary expenses to its plant or any salaries paid to its officers, or any wages to any persons except those actually employed and engaged in extraction, transportation, and milling of the ores in question."

To this instruction defendant excepted, "for that it is contrary to law and does not correctly define what mining and milling expenses may be deducted." Plaintiff in error now contends that instruction No. 11 (to which no exception was taken) and instruction No. 18 practically told the jury that a willful trespasser could have no credit either for extraction or for cost of treatment or handling, and that the court declined to advance the correct rule by refusing its requested instruction No. 43. This last instruction is not in the record and we are not advised as to its terms; and

instruction No. 18 is not subject to the objection now urged against it.

Paragraph 19 of the instructions was as follows:

"When one has the apex of a vein within the surface boundaries of his mining claim, and is entitled to extralateral rights thereon, such vein belongs to such person, and the possession of such mining claim is possession of such vein in its downward course to its uttermost depth, and the entire vein is treated and considered under the law the same as though it, in its entirety, was wholly within the surface boundaries of said mining claim, and a trespass thereon by a third person is treated and considered the same as though it was a trespass upon said claim within its surface boundaries. And therefore I instruct you that, in order to show good faith and honest intent in the trespass and extraction herein complained of, the defendant must satisfy you that its claim of good faith and honest intent would have been sufficient to excuse the willfulness of the trespass, had it been committed upon and within the surface boundaries of the St. Louis claim and the ore extracted therefrom."

To this instruction defendant excepted "for the reason that it does not correctly define the possession plaintiff must have in order to support an action for trespass, and is not applicable to the facts proven and conceded in this case."

In Montana Min. Company v. St. Louis Min. & Mill. Company, 102 Fed. 430, 135, 42 C. C. A. 415 (one of the former decisions of this court in this case), this court held that the possession of the surface of a mining claim is the possession of a vein or lode having its apex within the surface lines of the claim, although extending downward such vein may pass beyond the vertical side lines of the claim, and will support an action of trespass for the removal of ore from such vein beneath the surface of an adjoining claim.

Plaintiff in error contends that the court was in error in instructing the jury that the good faith and honest intent of the defendant in trespassing upon the vein in controversy and in extracting ore therefrom must be sufficient to excuse a similar trespass committed upon and within the surface boundaries of the St. Louis claim; that the instruction denied to the plaintiff the benefit of the inference resulting from the work being done within its own surface, and directed the jury in effect to disregard all the peculiar facts bearing on the title to the compromise strip and the present litigation with reference thereto in evidence in that case when considering the issue of honest belief of ownership. The instruction did not direct the jury to disregard any fact tending to show good faith and honest intent. It simply stated that the evidence of good faith and honest intent must be the same in both cases, and this was clearly correct. There cannot be one measure of good faith and honest intent in one case and a different one in the other. The facts may be different, but good faith and honest intent remain the same. In paragraph 12 of the instructions, the court made it clear that all facts and circumstances were to be considered by the jury in determining the question of good faith. The instruction of the court in that paragraph was as follows:

"In determining the question of the good faith of defendant in extracting and removing the ore in question, you are entitled to consider all the facts and circumstances shown by the evidence. If you find that the defendant acted under an honest belief that it was the owner of the ore in the disputed

ground, and had good right and lawful authority to extract the same, and that such belief' was based upon such facts and circumstances as that you believe that an ordinary man, acting as you find the defendant acted, would have had the honest belief that he owned such ore and had a right to remove it, then the trespass was not willful."

In paragraph 32 of the instructions the court instructed the jury as follows:

"In considering any ore extracted from block 8, part of which was removed under the authority of this court some time ago, and to which defendant asserted claim of title, you are charged that if the defendant desired to have the value of the ores so removed deducted from the amount of any verdict which may be rendered, it should have introduced evidence to show that the ores were offered to, or were left in the possession of, the plaintiff, and of their value; and if the evidence fails to disclose such facts to your satisfaction, defendant is not entitled to have any deduction therefor; on the other hand, if such facts are so disclosed, you should make a deduction in accordance with the general rule laid down in the charge."

To this instruction the defendant excepted "for the reason that the same is contrary to law and would require the defendant to surrender its contention that such ore justly belongs to it." It is urged, however, that the court charged the jury, in effect, that they should give no credit for ores held by the defendant under injunction process secured by the plaintiff itself, because it told them that defendant must have offered or left the ores in the possession of the plaintiff and proved their value, and this in face of the fact that the injunction order directed the defendant not to give them to any one, and the further fact that such surrender would have been an abandonment of defendant's claim of title, which formed the basis of its defense in the injunction suit. It appears that this question was before this court in the case reported in 102 Fed. 436, 42 C. C. A. 415. Discussing this matter, the court said:

"Error is assigned to the refusal of the court to instruct the jury not to include in their verdict the value of certain ores which had been mined, but which had been stored by the defendant therein, under an injunction issued in the action enjoining it from 'disposing of, treating, and reducing any ores heretofore removed or extracted from said premises,' for the reason that such ores were held subject to the order of the court, and had not been converted to the use of the defendant. There is nothing in the pleadings or in the bill of exceptions to show that such ores had been returned or tendered to the defendant in error, or in any way accounted for; nor was evidence offered for the purpose of definitely fixing the value of such ore so that the court could have properly instructed the jury to take the same into account. It was for the plaintiff in error, if it desired to have the value of such ores deducted from the amount of the verdict, to have caused the record to show that the ores were offered to, or left in the possession of, the defendant in error, and to have submitted evidence of their value."

We think this is a sufficient answer to this objection.

We have carefully examined the instructions as a whole, and we find them clear, direct, and in conformity with the law. Where, upon the evidence before the court, they have referred to questions admitted by the pleadings or previously determined by this court, they have in no way prejudiced the rights of the plaintiff in error.

Finding no error in the record, the judgment of the court below is affirmed.