MONTANA MINING CO., Limited, v. ST. LOUIS MIN. & MILL. CO. OF
MONTANA.

(Circuit Court of Appeals, Ninth Circuit. October 24, 1910.)

No. 1,809.

1. BOUNDARIES (§ 40*)—ASCERTAINMENT AND ESTABLISHMENT—QUESTIONS FOR JURY.

> Where there is ambiguity in the description as contained in a deed and the court is compelled to resort to extrinsic evidence to identify and fix the lines of the survey on the ground, such identification is a question of fact for the jury.

> [Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 196–204; Dec. Dig. § 40.*]

2. BOUNDARIES (§ 9*)—ASCERTAINMENT AND ESTABLISHMENT—EVIDENCE.

> Where there is uncertainty in the specific description in a deed, the quantity named may be of decisive weight in determining the true boundary.

> [Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 84; Dec. Dig. § 9.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. BOUNDARIES (§ 6*)—DESCRIPTION IN FIELD NOTES—COURSES AND DISTANCES
—LOCATION OF CORNERS.

The beginning corner of a survey does not control more than any other corner well ascertained, nor is it obligatory in tracing the survey to follow the calls in the field notes for courses and distances in the order there recorded; but where beginning at such initial corner, and following the calls for courses and distances, the other fixed corners must be ignored, and the result is a material variance in quantity, while by beginning at some other known point and reversing the calls and tracing the lines the other way the conditions are more nearly met, and the quantity corresponds practically with that called for, such course should be followed.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. § 52; Dec. Dig. § 6.*]

4. BOUNDARIES (§ 48*)—ASCERTAINMENT AND ESTABLISHMENT—RECOGNITION AND ACQUIESCENCE.

Where there was a controversy for many years between the owners of adjoining mining claims as to the ownership of a vein in a strip originally in dispute but afterward conveyed by one to the other in compromise, but no controversy with respect to the boundary line of such strip, the acquiescence of both parties in the dividing line as marked and its acceptance by the grantee of the strip as conforming to the· compromise agreement estops such grantee after the lapse of years from denying its correctness and claiming different or further ground.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 232–242; Dec. Dig. § 48.*]

5. PLEADING (§ 122*)—ISSUES.

In an action by the owner of a mining claim against the owner of an adjoining claim to determine plaintiff's extralateral rights, where the complaint alleged priority of discovery and location of plaintiff's claim, and the answer admitted priority of plaintiff's notice of location and of its patent and attached copies of the location notices of each party, which showed plaintiff's discovery to have been prior, a mere denial of plaintiff's allegation on information and belief did not raise an issue as to the question of priority.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 249–252; Dec. Dig. § 122.*]

6. EVIDENCE (§ 142*)—VALUE OF ORE CONVERTED.

· In an action against a mining company to recover for ore mined, removed, and disposed of by defendant from a vein owned by plaintiff, evidence of the value of similar ore taken from the same vein near by is admissible on the part of plaintiff to establish the value of that converted by defendant; it being presumably within the power of defendant to show the actual value of that taken if that shown by such evidence is excessive.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 416–423; Dec. Dig. § 142.*]

7. TROVER AND CONVERSION (§ 53*)—ACTION FOR TRESPASS AND CONVERSION OF ORE—RIGHT TO INTEREST.

An action to recover the value of ore alleged to have been mined from a vein owned by plaintiff and converted by defendant is the same in legal effect as an action for conversion of personal property, and under Rev. Codes Mont. §§ 6068, 6071, providing that the measure of damages for breach of an obligation not arising from contract is the amount which will compensate for all the detriment proximately caused thereby, and that the detriment caused by the wrongful conversion of personal property is presumed to be the value of the property at the time of its conversion with the interest from that time, the plaintiff in such action is entitled to interest on the value of the ore converted as matter of law.

[Ed. Note.—For other cases, see Trover and Conversion, Cent. Dig. § 254; Dec. Dig. § 53.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the Circuit Court of the United States for the District of Montana.

Action by the St. Louis Mining & Milling Company of Montana against the Montana Mining Company, Limited. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 148 Fed. 450.

This controversy has been before the courts in one form or another for a number of years. As the litigation has proceeded, the facts have been stated by the courts and will be found in the reported cases to which reference will be made. A restatement of the principal features of the controversy will, however, be necessary to a clear understanding of the present issues as they are now presented to this court.

The St. Louis quartz lode mining claim was located on the 28th of September, 1878, by Charles Mayger in Lewis and Clark county, Montana Territory. The notice of location declared that the locator "had discovered a vein or lode within the limits of the claim located." The adjoining Nine Hour quartz lode mining claim was located on the 26th day of July, 1880, by William Robinson and James Huggins. The declaratory statement declared that the lode had been discovered and located on the 26th day of July, 1880. The declaratory statement and notice of location of the St. Louis mining claim described a claim on the St. Louis lode 600 feet in width and 1,500 feet in length along the lode or vein. The declaratory statement and notice of location of the Nine Hour claim described a location on the Nine Hour lode 600 feet in width and 1,500 feet in length along the lode or vein. The general direction of these two veins was northwest and southeast. The Nine Hour claim was on the south and east of the St. Louis claim. At the southeast corner of the St. Louis claim there was a conflict in the location or surveys of the two claims. The surface area involved in this conflict was small, but the extralateral rights of the St. Louis company in a vein apexing within the St. Louis claim and dipping under the surface of the area in conflict has been the bone of contention in all this extraordinary litigation.

When Mayger made application for a patent for the St. Louis claim, adverse proceedings were commenced by Robinson and Huggins against Mayger in the District Court of the Third Judicial District of Montana to determine the right of possession to the ground in conflict. Before the case was tried, the parties reached an agreement by way of a compromise, and to carry this compromise into effect Mayger, on March 7, 1884, executed a bond to Robinson and his associates in which Mayger agreed to proceed at once and procure as soon as practicable a patent for the St. Louis claim and then to execute and deliver to Robinson and his associates a good and sufficient deed of conveyance of the compromise ground, which was particularly described in the bond as follows:

"Commencing at a point from which the center of the discovery shaft of the Nine Hour lode bears south 39 degrees 32 minutes east, said course being at right angles to the boundary line of the St. Louis lode, between corners 2 and 3, fifty feet distant; thence north 50 degrees 28 minutes east on a line parallel to the aforesaid boundary line of the St. Louis lode claim, between corners 2 and 3 thereof, 226 feet, to a point on the boundary line of the St. Louis lode between corners 1 and 2; thence south 20 degrees 28 minutes west along said boundary, between corners 1 and 2, 60.5 feet, to corner No. 2 of the St. Louis lode; 400.31 feet to corner No. 3 of the St. Louis lode; thence north 46 degrees 10 minutes west along the line of boundary of St. Louis lode between corners three and four, thirty feet, to a point; thence north 50 degrees 28 minutes east along a line parallel to the boundary line of the St. Louis lode between corners two and three, 230 feet, to the point of beginning, including an area of about 12,844.50 square feet, together with all the mineral therein contained."

As the eastern and western side lines of this compromise ground, as here described, were parallel lines and 30 feet apart, the ground has been referred to in the proceedings as the "30-foot strip," or "compromise ground."

Mayger proceeded to obtain a patent for the St. Louis claim, including the

compromise ground, as did also Robinson and his associates a patent to the Nine Hour claim, omitting the compromise ground. A patent to the St. Louis claim, including the compromise ground, was issued to Charles F. Mayger by the United States on the 22d day of July, 1887; and a patent to the Nine Hour claim, omitting the compromise ground, was issued to Robinson and his associates by the United States on the 4th day of June, 1888. Thereafter the plaintiff in error acquired the interest of Robinson and his associates, and the defendant in error the interest of Mayger. Hereafter the plaintiff in error will be referred to as the "Montana Company," and the defendant in error as the "St. Louis Company." The Montana Company demanded a conveyance of the compromise ground in accordance with the terms of the bond executed by Mayger, which being refused, suit was brought in the district court of the state (hereinafter referred to as the "specific performance case"), which rendered a decree in its favor. That decree having been affirmed by the Supreme Court of the state of Montana (20 Mont. 394, 51 Pac. 824), the St. Louis Company sued out a writ of error to the Supreme Court of the United States, and on October 31, 1898, that court affirmed the judgment of the Supreme Court of Montana (171 U. S. 650, 19 Sup. Ct. 61, 43 L. Ed. 320). In pursuance of the decree, the St. Louis Company on July 1, 1895, executed and delivered to the Montana Company a deed for the tract described in the bond, giving its boundaries "including an area of about 12,844.5 feet, together with all the mineral therein contained, together with all the dips, spurs and angles, and also all the metals, ores, gold and silver bearing quartz, rock and earth therein, and all the rights, privileges and franchises thereto incident, appended or appurtenant, or therewith usually had and enjoyed; and also all and singular the tenements, hereditaments and appurtenances thereto belonging or in any wise appertaining, and the rents, issues and profits therein, and also all and every right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in or to the said premises and every part and parcel thereof, with the appurtenances."

After the compromise agreement had been entered into, it was discovered that beneath the surface of the compromise ground there was a large body of ore which, it was claimed by the St. Louis Company, belonged to a vein apexing in the territory of the St. Louis claim. This was not the discovery vein upon which the location of the St. Louis lode was based, but was a secondary vein referred to in the proceedings as the "Nine Hour" or "Drum Lummon" vein or lode. This latter vein apexing for a certain distance in the St. Louis claim dipped to the east under the compromise ground and underneath the Nine Hour lode claim to the east of the compromise ground. The Montana Company had been mining ore from beneath the Nine Hour lode claim prior to 1893, but during that year began sinking a shaft upon the compromise ground. On September 16, 1893, the original complaint was filed in this action by the St. Louis Company against the Montana Company, and several individual defendants, claiming to recover $200,000 damages sustained by the trespass of the Montana Company in removing ore from so much of the Drum Lummon vein as had its apex in the St. Louis lode claim. In the original complaint the St. Louis Company alleged itself to be the owner of the entire St. Louis lode claim as patented. In the answer of the Montana Company it denied that the St. Louis Company was the owner of so much of the premises described in the complaint as were embraced in the compromise ground, which ground was described as in the bond for a deed executed by Mayger on March 7, 1884. It was alleged that prior to March 7, 1884, the said ground was a part of the Nine Hour lode mining claim, then the property of the predecessors in interest of the Montana Company, and that at the time of filing the answer the Montana Company was the owner of the ground and in the actual possession thereof and entitled to all the minerals therein contained. Proceedings were thereupon stayed in the present action, it being an action at law in the federal court, and suit was brought by the Montana Company against the St. Louis Company, as heretofore stated, for the specific performance of the agreement contained in the bond for a deed. The action, as has also been stated, resulted in a judgment in favor of the Montana Company for the specific performance of the terms of the bond providing for the execution of a deed for the conveyance of the compromise ground to the Montana Company.

On November 21, 1898, three weeks after the decision of the Supreme Court of the United States in the specific performance case, the St. Louis Company filed an amended and supplemental complaint in the present action, which omitted the individual defendants, and sought recovery from the Montana Company alone for the ore which it was alleged had been removed from the Drum Lummon vein apexing inside the surface location of the St. Louis claim. The damages sought to be recovered were fixed at the sum of $200,000, the amount mentioned in the original complaint. The purpose of the amended and supplemental complaint was to enforce the alleged extralateral rights of the St. Louis Company to any and all ores found in the Drum Lummon vein apexing in the St. Louis claim and dipping under the surface of the compromise ground and the Nine Hour claim. After issue had been joined upon this amended complaint, and, on June 26, 1899, the second amended and supplemental complaint was filed against the Montana Company alone, asking for the same relief, but alleging that since the filing of the original complaint the Montana Company had extracted ore of the value of $400,000, and a judgment was demanded for $600,000. To this second amended and supplemental complaint an answer was filed setting up the bond and deed heretofore referred to and pleading that by the terms of the bond and deed the St. Louis Company was estopped from claiming any part of the compromise ground or any mineral contained therein. Upon the trial of the case the court in its ruling upon the admission of testimony and in its instructions to the jury sustained the claim of the St. Louis Company to extralateral rights in the Drum Lummon vein in the compromise ground and under the Nine Hour claim to the extent that such vein apexed wholly within the St. Louis claim, but denied the claim to extralateral rights for so much of the vein which, crossing the side line of the St. Louis claim, apexed partly in the St. Louis claim and partly in the compromise ground. Under these rulings judgment was rendered in favor of the St. Louis Company for $23,209.

To review this judgment the Montana Company prosecuted a writ of error to this court on the ground that the St. Louis Company had no extralateral rights in the compromise ground. On the 14th day of May, 1900, the judgment of the Circuit Court for the District of Montana was affirmed. 42 C. C. A. 415, 102 Fed. 430. In the meantime the St. Louis Company had taken out a cross-writ of error to this court on the ground that it had extralateral rights in the compromise ground not only for so much of the Drum Lummon vein as apexed wholly within the St. Louis claim, but also for so much of the vein as by reason of its width apexed partly in the St. Louis claim and partly in the compromise ground. This court held that where a vein crosses a common side line between two mining claims at an angle, and the apex of the vein is of such width that it is for a given distance partly within one claim and partly within the other, the rights of the parties would be determined by the priority of the location and the entire vein considered as apexing upon the senior location until it had wholly passed beyond its side line. As the St. Louis claim appeared to be the prior location, this holding required a reversal of the judgment of the court below, which was directed accordingly, and the case remanded for a new trial as to the recovery sought for the conversion and value of the ores alleged to have been extracted from so much of the vein as apexed partly in the St. Louis claim and partly in the compromise ground; evidence as to the conversion of such ores having been excluded by the Circuit Court from the consideration of the jury. 44 C. C. A. 120, 104 Fed. 664, 56 L. R. A. 725. The Montana Company by separate writs of error then sought to have these two judgments reviewed in the Supreme Court of the United States, which latter court, on motion to dismiss and affirm, held that the judgment of the Circuit Court was entirely set aside by the second decision of this court, and therefore dismissed both cases on the ground that there was no final judgment. 186 U. S. 24, 22 Sup. Ct. 744, 46 L. Ed. 1039. Thereupon, on the filing of the mandate of this court, an order was entered setting aside the judgment in toto and ordering a new trial, which new trial was had on May 31, 1905, and resulted in a judgment in favor of the St. Louis Company for $195,000, which judgment was affirmed by this court. 147 Fed. 897, 78 C. C. A. 33.

To review this latter judgment the Montana Company sued out a writ of error to the Supreme Court of the United States and also made application

for a writ of certiorari. The latter writ was allowed, and upon the hearing of the case the judgment of this court was reversed and the case remanded to the Circuit Court, with instructions to grant a new trial. Montana Mining Co. v. St. Louis Mining Co., 204 U. S. 204, 27 Sup. Ct. 254, 51 L. Ed. 444. In its opinion the Supreme Court dissented from the decision of this court (Montana Min. Co. v. St. Louis Min. Co., 102 Fed. 430, 42 C. C. A. 415), upholding the extralateral rights of the St. Louis company in the compromise ground, and held that by the terms of the bond describing the ground and adding "together with all the mineral therein contained," and under the provisions of the deed executed in pursuance of the judicial decree following the same description and containing the same words and also the further words "together with all the dips, spurs, angles, * * * something more was intended and accomplished than the mere establishment of a surface boundary line." What this "something more" was is indicated by the reference of the court to the extralateral rights of mining claims and the conclusion reached by the court that the words used in the bond and deed under consideration were sufficient not only to convey the ground described, but to pass the extralateral rights of the St. Louis Company in the compromise ground. In support of this conclusion the court said:

"To the suggestion that giving this construction to the bond and conveyance is in effect the granting of a section of a vein of mineral, the answer is that there is nothing impracticable or unnatural in such a conveyance. It does not operate to transfer the vein in toto, but simply carves out from the vein the section between the vertical side lines of the ground and transfers that to the grantee. The title to the balance of the vein remains undisturbed.

"To the further suggestion that the owner of the apex might be left with a body of ore on the descending vein beyond the further side line of the compromise ground which he could not reach, the answer is that this assumes as a fact that which may not be a fact. The owner of the apex may be the owner of other ground by which access can be obtained to the descending vein, and it also is a question worthy of consideration whether granting a section out from a descending vein does not imply a right reserved in the grantor to pass through the territory of the section conveyed in order to reach the further portion of the vein."

Upon the filing of the mandate of the Supreme Court in the Circuit Court, the St. Louis Company obtained leave and filed its third amended and supplemental complaint. In this complaint the ownership of the Nine Hour claim by the Montana Company, the description of the vein underneath the Nine Hour claim from which it was charged the Montana Company had extracted ore, and the ownership of the ore by the St. Louis Company were alleged as follows:

"That the said defendant is and was the owner of what is known and designated as the Nine Hour quartz lode mining claim, situate and being east of the said St. Louis lode mining claim and of the thirty-foot strip, or compromise ground aforesaid, and that the discovery, location, and recordation of said St. Louis quartz lode mining claim and the United States patent therefor was made prior to the discovery, location, and recordation of the said Nine Hour lode mining claim.

"That within the said St. Louis lode mining claim, as the same was patented, is the apex of a vein which has such a dip or so far departs from a perpendicular in its descent into the earth as that it passes underneath the surface of the said Nine Hour lode mining claim; the whole of its apex being within the said St. Louis lode mining claim and outside of the said compromise strip, from a point on the east boundary line of said claim 503 feet distant from corner No. 1, being the northeast corner thereof, to a point on the west boundary line of said compromise strip 108 feet distant from the point of the intersection of said line with the east boundary line of said claim where the hanging wall of said vein crosses said west boundary line of said strip, from which point where the said hanging wall so crosses said west boundary line of said strip to a point at least 25 feet distant, a portion of the apex of said vein is within the St. Louis lode mining claim exclusive of such strip, from which last-mentioned point the said vein pursues such a course as that a portion of its apex, including the foot wall thereof, is either within the said

compromise strip or the said St. Louis lode mining claim, exclusive of such strip, until such vein passes beyond the south end line of the said St. Louis lode mining claim."

It was further alleged:

"That notwithstanding the right of said plaintiff in the premises, said defendant, on or about the 30th day of June, 1893, knowingly, wrongfully, and unlawfully, by means of drifts, shafts, tunnels, and underground workings, entered into and upon that portion of the vein, lode, or lead, the apex of which is between said point 503 feet distant from said corner No. 1, and situate and being to the east of the east boundary line of said St. Louis lode mining claim, as patented, and beneath the surface of said Nine Hour claim, and commenced extracting quartz, rock, and ore therefrom and removing and converting the same to its own use and benefit, and since said time has extracted quartz, rock, and ore and removed and converted the same to its own use and benefit, of the value of $500,000, on account of which this plaintiff has been damaged in said sum, a large part of which quartz, rock, and ore, of the value of many thousands of dollars, was by said defendant so removed from that portion of said vein the whole or a part of the apex of which is within the St. Louis lode mining claim exclusive of said compromise strip."

To this third amended and supplemental complaint the Montana Company filed its answer, in which it was admitted that it was the owner of the Nine Hour claim; admitted that the dates of the discovery, location, and of the recording of the notice of location of the St. Louis claim were each and every one prior to the dates of the discovery, location, and of the recording of the location notice of the Nine Hour claim; and that a patent was issued to the St. Louis Company prior in date to the patent issued for the Nine Hour claim, but denied that the St. Louis claim at the time of its discovery and location embraced the compromise ground, or any of its veins therein. It was averred that the ground embraced within the area described as the compromise ground and within the area in conflict between the St. Louis claim and the Nine Hour claim was first segregated from the public domain by the locators of the Nine Hour claim; and that as to all veins apexing within the said area of conflict the Nine Hour claim was senior and prior to the St. Louis claim.

It was alleged that the vein described in the third amended and supplemental complaint (Drum Lummon vein) from which it was charged ore had been extracted by the Montana Company, and for which damages were claimed by the St. Louis Company, was not the discovery vein, and at the time of t. ' location of the St. Louis vein was wholly unknown to the locators of that claim, and upon the line of said claim as patented this vein did in fact enter and depart from the same side line and not through either or both end lines; and because thereof it was alleged that the St. Louis Company never had, and did not then have, or own, any extralateral rights therein, or in the ores thereof lying eastward of a plane drawn vertically downward along said patented east line (independent of the conveyance of the compromise ground) and never did and did not then own any extralateral rights therein eastward of the west line of the compromise ground.

For a further and separate answer it was alleged, among other things, that the St. Louis claim was located on the 28th day of September, 1878, by the predecessor in interest of the St. Louis Company. A copy of the notice of location and declaratory statement of discovery was attached and made a part of the answer and marked "Exhibit A."

It was alleged that the Nine Hour claim was located on the 26th day of July, 1880, by the predecessors in interest of the Montana Company. A copy of their notice of location and declaratory statement of discovery was attached and made a part of the answer and marked "Exhibit B."

It was alleged that on or about the 16th day of August, 1881, the owner of the St. Louis claim caused the same to be surveyed with the view to obtaining a patent therefor from the government of the United States, and that, in causing the survey to be made, Charles F. Mayger, the then owner of the St. Louis claim, wrongfully extended and caused to be extended the easterly boundary line of the St. Louis claim so as to cover and embrace a portion of the ground which had theretofore been segregated from the public domain by the locators of the Nine Hour claim. The answer then recites the proceedings in the Land

Office by Mayger in his application for a patent for the St. Louis claim; the filing of an adverse claim to the ground in conflict by William Robinson and James Huggins, the owners of the Nine Hour claim; the commencement of an action by Robinson and his associates in the state court to determine the rights of the respective parties to the ground in conflict, and while this was pending the entering into an agreement by the parties to the controversy whereby the action was settled and compromised; the execution of a bond by Mayger to Robinson and his associates pursuant to the compromise agreement, wherein the former agreed in consideration of the withdrawal of the adverse claim to proceed to obtain a patent for the St. Louis claim, and when such patent was obtained to execute and deliver to Robinson and his associates or their heirs and assigns a good and sufficient deed to the premises mentioned and described in the bond (the compromise ground).

The answer alleges the issuance of a patent on July 22, 1887, to Mayger for the St. Louis claim as surveyed, including the area in conflict, and the issuance of a patent on June 4, 1888, to Robinson and his associates for the Nine Hour claim, excluding the area in conflict; the refusal of Mayger to execute a deed to Robinson and his associates for the compromise ground; the commencement of an action in the state court by the Montana Company (which by mesne conveyances had succeeded to the ownership of the Nine Hour claim), against Charles Mayger and the St. Louis Company to compel the defendants to comply with the terms of Mayger's bond and to compel the execution of a deed by Mayger and the St. Louis Company for the compromise ground as called for in the bond; the entry of a judgment in the case in favor of the Montana Company; and the execution of a deed by the St. Louis Company to the Montana Company for the compromise ground in accordance with the terms of the bond and the judgment.

In this answer reference is made to an allegation contained in the third amended and supplemental complaint that the hanging wall of the vein from which the ores, for which recovery is sought, are alleged to have been extracted, crossed the west boundary line of the compromise strip at a point 108 feet distant from the point of intersection of the compromise strip with the eastern boundary line of the St. Louis claim, and the foot wall crossed at a point at least 25 feet further south. With respect to this allegation, the answer denies that the said vein crosses the west line of the said compromise strip at said point; but alleges that the west line of the compromise strip, according to the calls of the compromise agreement and deed, should be located parallel to the boundary line of the St. Louis claim through a point distant 50 feet from the center of the discovery shaft of the Nine Hour claim, which point is ascertained by drawing a line 50 feet in length from the discovery shaft at right angles to the boundary line of the St. Louis claim between corners 2 and 3; that, when the west line of the compromise strip is located upon the ground in accordance with the call for the same in the deed; the point of departure of the vein from the St. Louis claim into the compromise ground will be found not to exceed 90 feet from the point of intersection between the west boundary line of the compromise ground and the east boundary line of the St. Louis claim, at which point of departure into the compromise ground the southerly plane bounding the rights of the St. Louis Company, if any, in veins apexing wholly within the St. Louis claim, should be drawn; that no ores had been extracted from beneath the surface of the Nine Hour claim north of the plane so drawn through the last-described point of departure, but all of the ores which had been extracted by the Montana Company, either beneath the compromise ground or beneath the Nine Hour claim, had been extracted at points south of said plane; that no ores had been extracted by the Montana Company from veins having their tops or apexes entirely within the St. Louis claim, exclusive of the compromise ground, as the same is called for in the deed.

The Montana Company by a cross-complaint and by way of a counterclaim alleged that it was the owner of the compromise ground and of the ores and precious metals contained therein, and in any and all veins throughout their entire depth, the apexes of which were within the Nine Hour claim and the compromise ground, at all points to the eastward of a vertical plane drawn downward along the west side line of the compromise ground as in the answer

described; that, notwithstanding the rights of the Montana Company, the St. Louis Company on or about June 30, 1893, and since said date had knowingly and wrongfully entered through underground workings of its own making into the portion of said vein owned by the Montana Company and extracted ores therefrom, and removed and converted the same to its own use and benefit in the value of $156,000, for which sum the Montana Company demanded damage.

The boundary lines of the St. Louis and Nine Hour claims involved in this controversy, the original area in conflict, the compromise ground, and the general course of the Drum Lummon vein are shown approximately on the annexed diagram.

Issues were joined by the filing of a replication by the St. Louis Company, and the case came on for trial before a court and a jury. At the conclusion of the testimony on behalf of the Montana Company, the St. Louis Company by leave of court amended its third amended and supplemental complaint and replication by withdrawing the allegation that the 32-foot strip or compromise ground was a part of the St. Louis claim, and substituting in lieu thereof an allegation contained in the former pleading that the compromise ground was and always had been a part of the Nine Hour claim. The complaint was further amended by an allegation that the apex of the vein in controversy passed entirely into the compromise ground at the point designated as the 268.6-foot plane, which point was 268.6 feet from the intersection of the west boundary of the compromise ground with the east side line of the St. Louis claim, between corners 1 and 2. The complaint as thus amended differed from the former complaint in the disclaimer of the St. Louis Company of any ore beneath the compromise ground, but insisting, as before, upon its extralateral rights to the ores in the Drum Lummon vein underneath the Nine Hour claim to the

east of the compromise ground. The amended complaint also differed from the former complaint in fixing the crossing of the foot wall of the Drum Lummon vein at the 268.6-foot plane instead of the 133-foot plane. As the jury found that all the ore for which a recovery was had by the St. Louis Company was extracted from that part of the vein north of the 133-foot plane, the latter amendment had ceased to have any significance in the case.

In submitting the case to the jury, after clearly defined instructions as to the law of the case, the court requested the jury to find specifically as to certain material and controlling facts as follows:

(1) Is the compromise strip, as contended for by the St. Louis Company and pictured on its map, Plaintiff's Exhibit No. 1, or as contended for by the Montana Company, and pictured on its map, defendant's Exhibit I?

The jury returned a finding that they found the compromise strip as claimed by the St. Louis Company.

(2) The jury was requested to find how much ore the Montana Company had extracted from the Drum Lummon or Nine Hour vein underneath the surface of the Nine Hour claim, north of the 133-foot plane and south of the 503-foot plane, and east of the compromise strip, and the value thereof.

The jury returned a finding that the ore extracted by the Montana Company from the vein as described was 1,912 tons, and that the value of such ore was $237,470.40.

(3) The jury was also requested to find how much ore had the Montana Company extracted from the Drum Lummon or Nine Hour vein underneath the surface of the Nine Hour claim, north of the 268.6-foot plane and south of the 503-foot plane, and east of the compromise ground, and the value thereof.

The jury returned the same finding to this question as to question No. 2.

(4) The jury were also requested to find what amount of ore the St. Louis Company had extracted from underneath the compromise strip, as they should find the same to be, and the value thereof.

The jury returned a finding to this question that the St. Louis Company had extracted ore from beneath the compromise strip amounting to 218.29 tons, and the value thereof was $34,341.38.

(5) The jury was also requested to find what amount of ore, if any, the St. Louis Company had extracted from underneath the Nine Hour claim belonging to the Montana Company, and outside of the compromise strip, and the value of the same.

To this question the jury returned a finding that no ore had been extracted by the St. Louis Company in the ground described belonging to the Montana Company.

The jury returned a verdict in favor of the plaintiff for the sum of $203,-129.02; and stated that this amount included interest and was in excess of any amount to which the Montana Company was entitled by virtue of its counterclaim or cross-complaint. The Montana Company brings the case here by writ of error.

E. C. Day, L. O. Evans, C. F. Kelley, and Charles J. Hughes, Jr., for plaintiff in error.

Gunn & Rasch, Clayberg & Horsky, and Walsh & Nolan, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). It is contended by the Montana Company that the St. Louis Company has no extralateral rights in the Drum Lummon vein underneath the Nine Hour claim. This contention is based upon two facts: (1) That the Drum Lummon vein was not the discovery vein of the St. Louis claim, but is what is called a secondary vein. (2) This secondary vein enters and departs from the St. Louis claim by a side line. Section 2322 of the Revised Statutes (U. S. Comp. St. 1901, p. 1425) provides that:

"The locators of all mining locations * * * on any mineral vein, lode, or ledge, situated on the public domain * * * shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations."

The patents for the St. Louis and Nine Hour claims, like all patents for mineral lands, conveyed to the grantees the respective claims and veins therein with the extralateral rights provided in the statute, with the express reservation in each patent:

"That the premises hereby granted, with the exception of the surface, may be entered by the proprietor of any other vein, lode or ledge, the top or apex of which lies outside of the boundary of said granted premises, should the same in its dip be found to penetrate, intersect or extend into said premises, for the purpose of extracting or removing the ore from such other vein, lode, or ledge."

The evidence in this case on the last trial, as upon former trials, established the fact that the Drum Lummon vein apexes for a certain distance within the St. Louis claim and dips underneath the Nine Hour claim. We are therefore of the opinion that the right of the St. Louis Company to extralateral rights in the Drum Lummon vein to the extent that that vein apexes within the St. Louis claim has been previously determined by this court. (102 Fed. 430, 42 C. C. A. 415; 104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725; 147 Fed. 897, 78 C. C. A. 33), and that this determination has been affirmed by the Supreme Court of the United States (204 U. S. 204, 27 Sup. Ct. 254, 51 L. Ed. 444), and that such has become the law of the case.

To what extent the St. Louis Company has extralateral rights in the Drum Lummon vein underneath the surface of the Nine Hour claim depends upon the extent to which that vein apexes within the St. Louis claim, and this question depends in turn upon the location of the boundary line between the St. Louis claim and the compromise ground, and the point where the Drum Lummon vein crosses that line. In the former trials of this case there had been no controversy about this fact. The lines of the compromise ground have been placed on numerous plats and maps showing a strip of ground 30 feet wide and containing about 12,844.5 square feet on the southeastern boundary of the St. Louis claim and parallel to the southeastern boundary line of that claim between corners Nos. 2 and 3, as described in the patent for that claim, and this description had been treated as correct by both parties. It had also been referred to in this court indifferently as either the "compromise ground," or "30-foot strip," and occasionally both terms have been used. 102 Fed. 430, 42 C. C. A. 415; 104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725; 147 Fed. 897, 78 C. C. A. 33; 168 Fed. 514, 93 C. C. A. 536. It was referred to in the Supreme Court in reciting the averments of the pleadings as the "30-foot strip or compromise ground." 186 U. S. 24, 22 Sup. Ct. 744, 46 L. Ed. 1039. The calls of the description of the compromise ground in the bond and deed do in fact describe

a strip of ground in the southeastern corner of the St. Louis claim with parallel sides 30 feet apart and containing about 12,844.5 square feet. But at the last trial the St. Louis Company called as a witness one John R. Parks, a mining engineer, who produced a map prepared under his direction showing the surface and underground workings of the St. Louis and Nine Hour claims, and the location of the 30-foot strip or compromise ground. The map was admitted in evidence and marked plaintiff's "Exhibit 1." When the witness had indicated on the map the courses and distances inclosing this strip of ground and particularly the location of the west side line of the compromise ground, the Montana Company objected to any further testimony with reference to this line as drawn upon the map for the reason that it was not drawn in accordance with the description of the ground as contained in the deed. The objection was overruled, and the witness traced the lines of the compromise ground in detail as shown upon the map. The objection was that the west side line of the compromise ground, which is also the east side line of the St. Louis claim after the compromise ground had been cut off, is not located as required by the initial call of the deed describing the compromise ground. That call is as follows:

"Commencing at a point from which the center of the discovery shaft of the Nine Hour lode bears south 39 degrees 32 minutes east, said course being at right angles to the boundary line of the St. Louis lode between corners 2 and 3, 50 feet distant."

The west side line of the compromise ground, as shown upon the map, plaintiff's Exhibit 1, instead of being 50 feet distant from the present discovery shaft of the Nine Hour claim, is 40 feet distant. To sustain the correctness of the lines of the compromise ground as shown on the map, the St. Louis Company introduced in evidence, over the objection of the Montana Company, evidence tending to show that the collar of the discovery shaft of the Nine Hour claim is not at the same point it was at the time of the compromise agreement; that the original shaft was perpendicular, such as a prospector usually sinks; that the shaft was afterwards sunk on an incline, corresponding with the dip of the vein, and the collar of that shaft was brought about 10 feet further west and nearer to the original eastern side line of the St. Louis claim. This evidence, if true, accounted for the fact that, if the commencement point were taken from the middle of the present shaft, it would make the width of the strip of compromise ground at the point of commencement 40 feet instead of 30 feet, as called for in the deed. Presumably for this reason the witness Parks in tracing the boundary of the compromise ground did not commence with the initial call of the deed, but commenced at corner No. 2 of the St. Louis claim as described in the patent; that is to say, he measured north from corner No. 2 of the patent, along the line in the direction of corner No. 1, 60.5 feet. This line followed in reverse direction the third call of the deed:

"Thence south 20 degrees 28 minutes west along the line of said boundary between corners one and two, 60.5 feet to corner 2."

He then commenced at corner No. 3 of the patent and measured along the line between corners 3 and 4, 30.34 feet to a point on that line; then by a survey connecting those lines and by mathematical calculations he found he had a line parallel to the east side line of the southern portion of the St. Louis claim inclosing a strip of ground 30 feet wide, but this strip of ground contains 12,929.8 square feet, instead of 12,844.5 square feet mentioned in the deed, a difference of 85.30 square feet. This difference is easily accounted for. In the original survey and plat for the adverse claim, the length of the side line of the St. Louis claim between corners Nos. 2 and 3 was determined by the surveyor as being 400.31 feet, and this was the length of the line subsequently incorporated into the bond. This line with the other calls in the bond described an area containing 12,844.5 square feet, the area of the compromise strip stated in the bond and deed. The deed erroneously gave the length of this line as 403 feet, instead of 400.31 feet, as stated in the bond. The survey for the map, plaintiff's Exhibit 1, makes the length of this line 402.34 feet, and the surface of the area, as before stated, 12,929.8 square feet. It appears that, if the point of commencement described in the deed is taken as 50 feet from the center of the discovery shaft as now located, the strip of compromise ground would be 40 feet wide at the point of commencement, but with the further calls of the deed the side lines would not be parallel, and the area of the surface would contain 16,095.4 square feet instead of 12,844.5 square feet; or if, commencing at the same point, the side lines of the strip are made parallel and 40 feet apart, disregarding the other calls of the deed, the area included would be 17,356.7 square feet, instead of 12,844.5 square feet, as called for by the bond and deed. It thus appears that, if the west side line of the compromise ground is located 50 feet from the discovery shaft of the Nine Hour claim as required by the first call of the bond and deed, no other call of the bond and deed is followed in describing the compromise ground, and the call for quantity is wholly disregarded. "Where there is uncertainty in specific description, the quantity named may be of decisive weight." Ainsa v. United States, 161 U. S. 208, 229, 16 Sup. Ct. 544, 552, 40 L. Ed. 673.

It is contended by the Montana Company that there was no controversy as to the description of the compromise ground; that it was described in the bond and deed and set forth in the amended complaint and admitted in the answer; that the west side line of the compromise ground was 50 feet distant from the center of the discovery shaft of the Nine Hour claim and was the dividing line between the St. Louis claim and the compromise ground. It is admitted by the St. Louis Company that prior to the last trial there had been no controversy upon the subject; that the compromise ground was described in the bond and deed as 30 feet wide with its west side line parallel to the east side line of the St. Louis claim, between corners numbered 2 and 3; that the courts had uniformly held as a matter of law that such was a description of the compromise ground, and the ground so described contained an area of 12,-

844.5 square feet. In other words, the primary contention of both parties is, that the question at issue was one of law for the court. The court below treated it as a mixed question of law and fact. There was ambiguity in the description as contained in the deed, and the court was compelled to resort to extraneous evidence to identify and fix the lines of the survey on the ground, and this identification was a question of fact for the jury, as held by the Supreme Court in Ayers v. Watson, 137 U. S. 584, 590, 11 Sup. Ct. 201, 34 L. Ed. 803, where a similar question was before the court relating to the identification of the lines of a grant of land in Texas. The only question then arises: Did the court submit this question to the jury with proper instructions? The court instructed the jury upon this question as follows:

"You have heard a great deal about the boundaries of what was spoken of as the compromise strip, and, as the matter is important, I will direct your attention to it. The bond and the deed with respect to it are in evidence before you. In applying the description set forth in the bond for, and conveyance of, the ground, you are permitted to reverse the calls and trace the lines the other way, and should do so whenever by so doing the lands embraced would more nearly harmonize with the calls and objects of the grant. If an insurmountable difficulty is met with in running the lines in one direction, yet is entirely obviated by running them in the reverse direction, and all the known calls of the survey are harmonized by the latter course, it is only a dictate of common sense to follow it. The beginning point of a survey does not control more than any other point actually well ascertained, and you are not bound to follow the calls of a grant in the way said calls stand in the words of description. Therefore, if you can take the description, as specified in the bond and deed, by beginning at any point mentioned therein, and thus apply said description to the ground more nearly than in commencing at the beginning point of said survey as mentioned in said description, then you should so apply said description."

This instruction followed the rule laid down in Ayers v. Watson, 137 U. S. 584, 11 Sup. Ct. 201, 34 L. Ed. 803, where the Supreme Court, referring to an instruction given the jury by the trial court, said:

"The judge was entirely right in charging that the footsteps of the original surveyor might be traced backward as well as forward; and that any ascertained monument in the survey might be adopted as a starting point for its recovery."

The court said further, at page 598 of 137 U. S., at page 208 of 11 Sup. Ct. (34 L. Ed. 803):

"The 'beginning' corner does not control more than any other corner actually well ascertained, nor are we constrained to follow the calls of the grant in the order said calls stand in the field notes there recorded, but are permitted to reverse the calls and trace the lines the other way, and should do so whenever by so doing the land embraced would most nearly harmonize with the objects of the grant."

The court said further, at page 604 of 137 U. S., at page 208 of 11 Sup. Ct. (34 L. Ed. 803):

"If an insurmountable difficulty is met with in running the lines in one direction, and is entirely obviated by running them in the reverse direction, and all the known calls of the survey are harmonized by the latter course, it is only a dictate of common sense to follow it."

In Burge v. Poindexter (Tex. Civ. App.) 56 S. W. 81, 82, the court said:

"It is not absolutely necessary, in locating a survey, to follow the calls of the grant in the order given. If, by reversing the calls, a more accurate result can be obtained in locating the land surveyed than by following the order of the field notes, then that method should be pursued."

For the purpose of further identifying the location of the boundary lines between the St. Louis claim and the compromise ground as agreed upon by the parties in interest, testimony was introduced by the St. Louis Company, over the objection of the Montana Company, tending to show that the compromise ground was staked off and marked upon the ground; that the width of the ground by such staking was 30 feet; the acquiescence of the party to the correctness of such stakings; that the Montana Company went into possession of the compromise ground as staked and built a shafthouse immediately east of the line so staked; that the St. Louis Company started a shaft immediately to the west of such line, the line being the dividing line between the two shafts; the building of brattices or board partitions across the workings beneath the surface of the compromise ground at or near the vertical plane so staked off; the fact that the brattices or partitions had the effect of preventing any one from entering the workings of the compromise ground from the St. Louis side; the fact that the St. Louis Company extracted ore from the apex of the vein down to the vertical line as established by projecting the west side line of the 30-foot strip as staked vertically downward; that the Montana Company made no claim for any ore taken by the St. Louis Company from the west side of this line. The admission of this and other testimony relating to the west side line of the compromise strip is assigned as error, as is also the instruction of the court to the jury with respect to such testimony.

The testimony was clearly admissible. It was for the jury to ascertain and locate the line in controversy, and to enable it to perform that duty intelligently, any evidence, whether parol or written, that had any natural or reasonable tendency to show its location, was admissible. Washington Rock Co. v. Young, 29 Utah, 108, 80 Pac. 382. In a note to this case as reported in 110 Am. St. Rep. 666, 682, the rule relating to the location of a boundary line is stated as follows:

"When questions arise as to the true location of a boundary line, a practical location thereof by the persons interested becomes of the highest importance. It is a well-settled rule of law, resting upon public policy, that a practical location of boundaries which has been acquiesced in for a long period of years will not be disturbed. It is binding on the parties thereto and their privies in estate. This doctrine has been adopted as a rule of repose with a view of quieting titles and preventing litigation"—citing the cases of McGee v. Stone, 9 Cal. 600; Dupont v. Starring, 42 Mich. 492, 4 N. W. 190; Smith v. State, 23 N. J. Law, 130; Laverty v. Moore, 33 N. Y. 658; Sherman v. Kane, 86 N. Y. 57; Katz v. Kaiser, 154 N. Y. 294, 48 N. E. 532; O'Donnell v. Penney, 17 R. I. 164, 20 Atl. 305. "It does not necessarily rest upon an actual agreement nor upon prescription or legal limitation. Haring v. Van Houten, 22 N. J. Law, 61."

The Montana Company contends that the ruling of the court in admitting testimony and in instructing the jury in accordance with

this rule was error, and cites the case of Schraeder Mining Co. v. Packer, 129 U. S. 688, 699, 9 Sup. Ct. 385, 32 L. Ed. 760, as establishing a different rule. In that case the court said:

"Owners of adjacent tracts of land are not bound by consent to a boundary which has been defined under a mistaken apprehension that it is the true line, each claiming only the true line, wherever it may be found, and that in such case neither party is precluded or estopped from claiming his own rights under the true one, when it is discovered."

The evidence in that case to which this instruction referred related to an alleged assent by one of the parties to a boundary line between two tracts of land located in ignorance of both parties as to the existence of any conflict as to the true line. That is not this case, and the court draws the distinction between the facts of that case and a case such as the one at bar in the following language, referring to the charge of the trial court to the jury (on page 698 of 129 U. S., on page 388 of 9 Sup. Ct. [32 L. Ed. 760]) :

"The assent was given, not to settle a dispute, but to acquiesce in the running of a line about which no dispute had then arisen, and upon the supposition that the person engaged in running it knew where the true lines were; that it was an acquiescence resulting from a pure mistake and error, which should not bind the plaintiff or estop him from claiming his rights when he discovered the mistake."

The Supreme Court, commenting on this charge, said:

"We think the court in its charge brought out clearly and fairly before the jury the distinction between a mutual undertaking to adjust and settle a doubtful and disputed dividing line, in case of conflicting titles, on the one hand, and, on the other, the consent of parties to mark a boundary supposed to run between undisputed tracts, but in ignorance and mistake of both as to the existence of any conflict."

The law of that case is clearly not applicable here, where there was a controversy for many years as to the ownership of a vein in the compromise ground; but no controversy with respect to the dividing line between that ground and the St. Louis claim, but evidence of a knowledge of all the facts by the parties and a mutual assent and agreement as to its location.

The court in its instructions to the jury concerning the acts and conduct of the parties to the controversy and their declarations said:

"Consider whether for many years the parties thereto and each of their predecessors in interest acquiesced and recognized that the compromise ground was a strip 30 feet wide along the above-mentioned east boundary line of the St. Louis claim, as surveyed for patent, and, as I have said, any and all other evidence that was introduced by the plaintiff and the defendant in the trial of the case, showing or indicating, or tending to show, what the intention of the parties to the bond was, and the acts of the parties thereto, and their successors in interest. If you believe that the parties hereto and their predecessors in interest applied the description in said bond, by markings on the ground, and occupied it with reference to said markings, and, for many years, accepted a strip of ground 30 feet in width as conforming to the description in said bond, as shown by plaintiff's Exhibit 1, then and in that event the defendant here would be and is estopped from claiming that a strip of ground 30 feet wide along the east boundary line of the St. Louis claim, as surveyed for patent, between corners numbered 2 and 3, does not comply with the description of said compromise strip in said bond and deed, and from claiming or asserting that any other different or further ground was included in the description set forth in said bond and deed."

To these instructions the Montana Company objected in the following language:

"The defendant objects and excepts to so much of the court's instructions as referred to the drafting of the description of the compromise ground, and as to the acts of acquiescence and estoppel with reference to the compromise ground."

This objection was indefinite; it simply identifies the part of the instruction with which the Montana Company was not satisfied without in any manner apprising the court of the ground of the objection. The attention of the court was not called to the specific proposition which the Montana Company desired modified or withdrawn, and for that reason might well be disregarded. But it is not necessary to dispose of the objection in that way. The court showed by its instructions that it understood the case in all its bearing and was fully advised as to the law applicable thereto. The objection that there was no plea of estoppel on the part of the St. Louis Company is answered by the fact that the position of the St. Louis Company did not require that it should make such a plea. It alleged the ownership of the St. Louis claim and the vein in question, save as to the compromise ground. The line dividing the compromise ground from the St. Louis claim was not in controversy until the last trial, when the map of the St. Louis Company showing the location of the compromise ground was offered in evidence and was then objected to by the Montana Company on the ground that the witness had not drawn the line in accordance with the description of the compromise ground contained in the deed and complaint. There was no place for a plea of estoppel in such a proceeding. The objection that the court did not instruct the jury that, if the line in question had been fixed by acquiescence and agreement between the parties, such acquiescence must have been continued for a period of time at least equal to the statute of limitations, to be binding upon the Montana Company, cannot be sustained. The evidence was not introduced for the purpose of establishing adverse possession, but for the purpose of showing that the line had been drawn by the parties and marked upon the ground as the true line agreed upon in the compromise agreement. Upon the evidence, and under the instructions given by the court, the jury found the compromise strip as contended for by the St. Louis Company, and as pictured on its map, plaintiff's Exhibit 1. The compromise ground was there shown as a strip 30 feet wide and its western boundary line as claimed by the St. Louis Company.

It is contended by the Montana Company that, the compromise ground having been patented as a part of the St. Louis claim, and the St. Louis Company having conveyed the compromise ground to the Montana Company, the rights of the parties in the Drum Lummon vein are to be determined by the relation of grantor and grantee; and as the general rule of construction applicable to all grants is that, where it is not possible to determine from the deed just what is conveyed, the deed must be construed in favor of the grantee; that in the present case the grantee received a grant of a portion of the apex of the Drum Lummon vein, which by reason of its width was

partly in the St. Louis claim and partly in the compromise ground; that, as the vein was not susceptible of division, the deed must be construed against the grantor, and the whole of the vein must be held to have passed to the Montana Company. There are two answers to this contention: The first is that the purpose of this action was to determine from the deed, and the testimony relating thereto, just what was conveyed by the deed; and that fact has been determined by the verdict of the jury. In the absence of error in the proceeding, the grant as there determined must be held to be definite, certain, and free from ambiguity. The second answer is that we are not now dealing with the compromise ground. All controversy concerning the extralateral rights of the St. Louis Company in the Drum Lummon vein under the compromise ground was determined and set at rest by the Supreme Court of the United States in its decision in 204 U. S. 204, 27 Sup. Ct. 254, 51 L. Ed. 444. The deed related only to the compromise ground; it did not in any way purport to convey extralateral rights elsewhere, and the grantor parted with no rights in the Nine Hour claim, excluding the compromise ground. The relation of the St. Louis claim to the Nine Hour claim to the east of the compromise ground has been in no way disturbed and remains precisely what it was prior to the compromise agreement. This the Supreme Court was careful to state in its decision on page 218 of 204 U. S., on page 257 of 27 Sup. Ct. (51 L. Ed. 444):

"To the suggestion that giving this construction to the bond and conveyance is in effect the granting of a section of a vein of mineral, the answer is that there is nothing impracticable or unnatural in such a conveyance. It does not operate to transfer the vein in toto, but simply carves out from the vein the section between the vertical side lines of the ground and transfers that to the grantee. The title to the balance of the vein remains undisturbed."

What were the extralateral rights of the St. Louis claim in the Drum Lummon vein under the Nine Hour claim excluding the compromise ground? In the decision of this court in 104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725, this court considered the question of extralateral rights of the St. Louis Company in the Drum Lummon vein, which by reason of its width was partly within the St. Louis claim and partly within the compromise ground. This court held that, inasmuch as neither the statute nor the authority of adjudicated cases permitted a division of the crossing portion of the vein, the rights of the parties would be determined by the priority of location and the entire vein considered as apexing upon the senior location until it had wholly passed beyond its side line. The compromise ground having been eliminated, the law is now applicable to the extralateral rights of the St. Louis claim under the Nine Hour claim, excluding the compromise ground. With respect to this question, the Montana Company contends that the court erred in taking from the jury the question of the priority of location of the St. Louis and Nine Hour claims. The court instructed the jury as follows:

"Accordingly, for all purposes of this case, it must be considered that all the ground within the limits of the survey for patent above referred to, except the compromise ground, as you may determine it to be, was within the St. Louis claim, as located, and that such location was prior in time to any

location of the defendant or its predecessors in interest of the Nine Hour claim."

The court also refused to submit the question of priority of discovery to the jury. It is contended by the Montana Company that by its answer to the St. Louis Company's third amended and supplemental complaint it denied and put in issue the priority of discovery and location of the St. Louis claim, and the question was one for the jury.

It is true that by its answer the Montana Company denied upon information and belief that the date of discovery and location of the St. Louis claim was prior to the discovery and location of the Nine Hour claim; but it admitted that the date of the recording of the notice of location of the St. Louis claim was prior to the date of the recording of the location notice of the Nine Hour claim; and that the patent was issued for the St. Louis claim prior in date to the patent issued for the Nine Hour claim. But the notices of location of both the St. Louis and Nine Hour claims were attached and made a part of the answer. In the notice of the St. Louis claim, dated September 28, 1878, the locator states that "he has discovered a vein or lode within the limits hereby located." In the Nine Hour claim the notice is that the locator has discovered and located a claim on the 26th day of July, 1880.

In the replication of the St. Louis Company, the allegations of the answer relating to the location and discovery of the two claims as here alleged were admitted. But in turning to the answer of the Montana Company we find that there is a further denial that the St. Louis claim at the time of its discovery and location embraced the compromise ground, and as to all veins apexing wholly or in part within the compromise ground, and particularly with respect to the vein described as the Drum Lummon vein, it is alleged that the discovery and location of the Nine Hour claim was prior to the acts of the predecessors of the St. Louis Company in discovering and locating that vein in the St. Louis claim. This is not a denial that the discovery in the St. Louis claim, and the location of that claim exclusive of the compromise ground, was not prior to the discovery in the Nine Hour claim; and the allegations respecting the compromise ground show that it was not the intention of the Montana Company to put in issue the question of the priority of the St. Louis claim, either in discovery or location over the Nine Hour claim, excluding the compromise ground. Under this state of the pleadings, if we exclude the compromise ground, as we must under the decision of the Supreme Court, there was no issue as to priority, either in the location or discovery of the St. Louis claim. It was admitted that the St. Louis was the older claim, and under the law it took the entire width of all veins apexing within the claim including the Drum Lummon vein to the extent that that vein apexed within the St. Louis claim, and this despite the fact that a portion of the width of the vein at the point of crossing was outside the surface side line of the claim extended downwards vertically. Lawson v. United States Min. Co., 207 U. S. 1, 15, 28 Sup. Ct. 15, 52 L. Ed. 65. The court was

therefore right in withdrawing from the jury the question of priority of discovery as between the St. Louis claim and the Nine Hour claim, excluding the compromise ground.

It is objected that the court admitted immaterial, irrelevant, and incompetent testimony, introduced on behalf of the St. Louis Company, for the purpose of establishing the value of ores taken from the vein in question by the Montana Company from under the Nine Hour claim. The ore sued for had been taken and carried away by the Montana Company. The St. Louis Company was therefore unable to prove the value of the specific ore taken, but it was allowed to show the value of similar ores taken from the same vein near by. The evidence appears to have been the best the St. Louis Company could secure. If the value of the ore thus ascertained was incorrect and excessive, the presumption is that the Montana Company, having taken the ore and disposed of it, had the means to show its actual value.

It is objected that the court instructed the jury that, if they believed that the St. Louis Company was entitled to a verdict in its favor, it was also entitled to interest upon the amount found from the date of conversion of the ore by the Montana Company, if there had been conversion, to the date of the rendition of the verdict by the jury at the rate of 8 per cent. per annum. It is contended that the action was the local action of trespass, and not the transitory action of conversion; that interest as an element of damages is the creation of statute, and, as there is no statutory provision for interest in the state of Montana as an element of damages in an action of trespass, it was not recoverable. No claim was made for damages because of injury to the land, but judgment was demanded for the value of the ore which it was alleged had been converted by the Montana Company. The case was tried upon the theory that it was an action to recover the value of ore converted. In the case of United States v. Ute Coal & Coke Co., 158 Fed. 20, 85 C. C. A. 302, Judge Sanborn, referring to a claim that the cause of action in that case was one for trespass upon land, and not a cause of action for the conversion of coal taken from the land, said:

"The cause of action for trespass upon the land, and for the taking from it and conversion of coal, timber, or other personal property wherein the only damage alleged is the loss of the value of the personal property converted, is the same in legal effect as a cause of action for the conversion of the personal property."

This rule of action is fully supported by Stone v. United States, 167 U. S. 178, 182, 17 Sup. Ct. 778, 42 L. Ed. 127.

The statutes of Montana provide as follows (Rev. Codes, §.6068):

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Rev. Codes, § 6071, is as follows:

"The detriment caused by the wrongful conversion of personal property is presumed to be: (1) The value of the property at the time of its conversion, with the interest from that time. * * * "

The claim that interest was not recoverable as a matter of right, but rested in the discretion of the jury, is answered by the case of Drumm-

Flato Commission Co. v. Edmisson, 208 U. S. 534, 28 Sup. Ct. 367, 52 L. Ed. 606.

It is further contended that, if the St. Louis Company was entitled to recover interest, the Montana Company was also entitled to interest on its counterclaim. The presumption is that it did recover such interest. The court instructed the jury that in no event could it find for the Montana Company upon its counterclaim for an amount in excess of the sum prayed for in its answer, "together with interest thereon at the rate of 8 per cent. per annum from the date of extraction to the date of the verdict." This was equivalent to an instruction that the Montana Company was entitled to interest on any sum the jury might find in its favor on the counterclaim, providing such finding should not exceed the amount prayed for in the answer.

It is objected that the court permitted the St. Louis Company at the close of the case on the part of the Montana Company to amend its pleadings so as to substantially change the cause of action. The amendments referred to changed the allegation of the complaint as to the crossing of the foot wall of the Drum Lummon vein from the 133-foot plane to a point further south designated as the 268.6-foot plane. As the jury found that all the ore extracted by the Montana Company was from that part of the vein north of the 133-foot plane, the amendment did not prejudice the case of the Montana Company in any particular. An amendment alleging that the compromise ground had always been a part of the Nine Hour claim had the effect of making the allegations of the third amended and supplemental complaint as amended conform to the testimony relating to the title to that ground and as alleged in the original amended and supplemental complaint; but, as has already been stated, the compromise ground has been eliminated from the case so far as the St. Louis Company's rights are concerned, and the allegations concerning it have no bearing upon the issues as now presented, except as the ownership of the ground forms the basis of the Montana Company's counterclaim. These amendments may therefore all be treated as having been irrelevant and immaterial.

We find no error in the record.

The judgment of the Circuit Court is therefore affirmed.